191 F.3d 1181 (9th Cir. 1999)
 JOE LEONARD LAMBRIGHT, Petitioner-Appellant,
v.
TERRY STEWART, Director, Arizona Department of Corrections, Respondent-Appellee.
ROBERT DOUGLAS SMITH, Petitioner-Appellant,
v.
TERRY STEWART, Respondent-Appellee.
ROBERT DOUGLAS SMITH, Petitioner-Appellant,
v.
TERRY STEWART, Respondent-Appellee.
 Nos. 96-99020, No. 96-99025, No. 96-99026
 United States Court of Appeals, Ninth Circuit
 Argued and Submitted August 19, 1999--San Francisco, California
Filed October 8, 1999
 
 David P. Tiers, Tucson, Arizona (argued); Thomas E. Higgins, Jr., Tucson, Arizona, for petitioner-appellant Joe Leonard Lambright.
 John F. Palumbo, Law Offices Pima County Public Defender, Tucson, Arizona (argued); Jon A. Young, Tucson, Arizona, for petitioner-appellant Robert Douglas
 Scott Bales, Solicitor General, Phoenix, Arizona (argued); Eric Olsson, assistant Attorney General, Tucson, Arizona, for the respondents-appellees.
 Appeals from the United States District Court for the District of Arizona; Richard M. Bilby, Chief Judge, Presiding, D.C. Nos. CV-87-00235-RMB, D.C. No. CV-87-00234-RMB
 Before: Procter Hug, Jr., Chief Judge, James R. Browning, Mary M. Schroeder,
 Stephen R. Reinhardt, Alex Kozinski, Diarmuid F. O'Scannlain, Stephen S. Trott,
 Ferdinand F. Fernandez, Thomas G. Nelson, Susan P. Graber, and Kim M. Wardlaw, Circuit Judges.
 Opinion by Judge Fernandez; Dissent by Judge Reinhardt
 FERNANDEZ, Circuit Judge:
 
 
 1
 Joe Leonard Lambright and Robert Douglas Smith were found guilty of murder and sentenced to death. Their convictions and sentences were affirmed by the Arizona Supreme Court,[1] and they, ultimately, sought federal writs of habeas corpus on various grounds. The district court denied the writs and they appealed. A three-judge panel of this court ordered that the writs be granted on the single ground that they were deprived of their constitutional rights when the Arizona trial court used dual juries (one for each of them). See Lambright v. Stewart, 167 F.3d 477 (9th Cir. 1999). It did not decide the other issues that they raised. We withdrew the panel's opinion and ordered that the issue be heard en banc. See Lambright v. Stewart, 177 F.3d 901 (9th Cir. 1999). Because we disagree with the panel's determination, we now affirm the district court on the dual jury trial issue.
 
 BACKGROUND
 
 2
 Lambright and Smith were traveling across the country with Lambright's girlfriend, Kathy Foreman. Smith was troubled by the fact that while Lambright and Foreman had intercourse in his presence, he did not have anybody along to satisfy him. For his part, Lambright thought that he "would like to kill somebody just to see if he could do it. " Lambright I, 138 Ariz. at 66, 673 P.2d at 4. They decided that both desires could be fulfilled, and they set out with Foreman to find a victim. They found Sandy Owen and kidnaped her. Smith raped her on the way to a mountain site where they all got out of the car and Smith raped Owen again as Lambright and Foreman had intercourse. What happened next was that Smith began choking Owen, and Lambright declared that she must be killed. So, "Lambright took Foreman's knife out of its sheath and began stabbing the victim in the chest andabdomen, twisting the knife around inside of her. Smith held one of the victim's arms while she was being stabbed, and Foreman held the other arm." Id. at 67, 673 P.2d at 5. After that, "Smith unsuccessfully tried to break Ms. Owen's neck by twisting her head. Then Lambright, Foreman or both began cutting deeply into the victim's neck with the knife. . . . The victim remained alive, and was at least semiconscious, as she attempted to raise herself up on one arm. Lambright picked up a large rock and hurled it at her head. Foreman testified that as he threw the rock he yelled `Die, bitch.' " Id. The three then drove off in a celebratory mood, playing the piece "We Are the Champions" as they went. See id. Once caught, the trio's song changed. Foreman turned state's evidence, was given immunity, and testified against her erstwhile lover and his friend. Lambright confessed, but deemed Smith to be the worst of the three. Smith, too, confessed, but he dubbed Foreman and Lambright as the real killers.
 
 
 3
 Lambright and Smith were joined in a single indictment because of their jointly facinorous conduct, but"[i]n light of the defendants' confessions, which were not totally interlocking, and the appearance of potentially antagonistic defenses, [the trial judge] severed the cases of Lambright and Smith." Id. As the Arizona Supreme Court pointed out:
 
 
 4
 Because most of the evidence was relevant to both defendants, however, the judge decided to hold a single "dual jury" trial, in which two separate juries were empaneled, each to decide the guilt or innocence of only one defendant, and each permitted to hear only evidence admissible against that one defendant. Id.
 
 
 5
 The Arizona Supreme Court then held that the trial judge had erred when he resorted to the use of dual juries. See id. at 69, 673 P.2d at 7. However, it also determined that no prejudice had been shown. See id. at 70, 673 P.2d at 8. Lambright and Smith now ask us to overturn the district court's decision and their convictions because, as they say, the use of the dual juries violated their due process rights.[2]
 
 JURISDICTION AND STANDARD OF REVIEW
 
 6
 The district court had jurisdiction pursuant to 28 U.S.C. S 2254. We have jurisdiction pursuant to 28 U.S.C. S 1291. "We . . . review a district court's decision to grant or deny a S 2254 petition de novo." Smith v. Stewart, 140 F.3d 1263, 1268 (9th Cir. 1998).
 
 DISCUSSION
 
 7
 Lambright and Smith suggest that the fact that the state trial court violated state procedural rules should lead to a decision that their due process rights were violated in this case, and that, indeed, dual jury use in their circumstances is so unreliable that the United States Constitution must have been violated. We disagree.
 
 
 8
 An error of state procedure is not, ipso facto, federal constitutional error. See Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991). Rather, as the Supreme Court has told us with some asperity:
 
 
 9
 We have stated many times that "federal habeas corpus relief does not lie for errors of state law. " Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution,laws, or treaties of the United States.
 
 
 10
 Id. at 67-68, 112 S. Ct. at 480 (citation omitted); see also Gerlaugh v. Stewart, 129 F.3d 1027, 1032 (9th Cir. 1997); Christian v. Rhode, 41 F.3d 461, 469 (9th Cir. 1994).
 
 
 11
 In this case there may or may not have been a state procedural error. In Lambright I, 138 Ariz. at 67-70, 673 P.2d at 5-8, the Arizona Supreme Court said that the trial court had erred when it used dual juries. That was so because the court felt that "local rules must first be approved by this court . . . ." Id. at 69, 673 P.2d at 7 (citation omitted). Thus, because the court had not specifically authorized the use of dual juries, that use was deemed to be inappropriate. However, on further reflection, the Arizona Supreme Court has decided that the use of dual juries is not even an Arizona procedural error and has actually overruled Lambright I. As it said in Hedlund v. Sheldon, 173 Ariz. 143, 146, 840 P.2d 1008, 1011 (Ariz. 1992), " `[t]rial judges have inherent power and discretion to adopt special, individualized procedures designed to promote the ends of justice in each case that comes before them.' " Id. (citation omitted). Therefore, "[t]he trial judge's decision to empanel a dual jury was not a local rule, and thus the judge's implementing order did not exceed his authority . . . ." Id. Just how that change of heart should be treated for purposes of this case need not be mooted. Even if we assume that Hedlund does not tell us what the law always was -that Lambright I was just a mistaken grasp at the true rule of law -the most that we have is a procedural error by the trial court. That does not demonstrate that, because jury use was involved, there was a federal constitutional error.
 
 
 12
 No doubt, under the Sixth Amendment to the United States Constitution a defendant in a criminal case has a right to a jury trial, but that does not even mean that a state is required to use the traditional twelve-person jury. Variations are permitted. See Williams v. Florida, 399 U.S. 78, 86 & 102-03, 90 S. Ct. 1893, 1898 & 1907, 26 L. Ed. 2d 446 (1970). Nevertheless, there are limits. The state cannot reduce the number below six persons, see Ballew v. Georgia, 435 U.S. 223, 244-45, 98 S. Ct. 1029, 1041, 55 L. Ed. 2d 234 (1978), and if the state goes that low, the determination must be unanimous. See Burch v. Louisiana, 441 U.S. 130, 138-39, 99 S. Ct. 1623, 1627-28, 60 L. Ed. 2d 96 (1979); cf. Sochor v. Florida, 504 U.S. 527, 530, 112 S. Ct. 2114, 2118, 119 L. Ed. 2d 326 (1992) (jury recommendation regarding death penalty not unanimous).
 
 
 13
 The lower limit is a recognition of the fact that"[a]t some point [a] decline [in numbers] leads to inaccurate fact-finding and incorrect application of the common sense of the community to the facts." Ballew, 435 U.S. at 232, 98 S. Ct. at 1035. Accuracy of the result will be affected. See id. at 234, 98 S. Ct. at 1036. And verdicts vary as juries become smaller. See id. at 236, 98 S. Ct. at 1037. In short, the process will become so unreliable that the jury will not be functioning in a way required by the Sixth Amendment; that is to say, in essence there will not be a jury. So, while states can provide for different numbers of jurors (experiment if you will), they cannot tinker with jury size to the extent that what is left bears the appellation "jury" but is not even an allotrope of the traditional institution that we have come to know and revere.
 
 
 14
 That is far from saying that every experiment (jury or otherwise) leads to unreliability; indeed, many experiments lead to better and stronger institutions. In other words, "experiment" is not a pejorative word. As the Third Circuit said over forty years ago, "fair new procedures .. . are allowable, although not traditional." Byrne v. Matczak, 254 F.2d 525, 529 (3rd Cir. 1958) (even though dispersal of jurors during deliberation was contrary to old common law, it was permissible); see also Chandler v. Florida, 449 U.S. 560, 57879, 101 S. Ct. 802, 811-12, 66 L. Ed. 2d 740 (1981); Galloway v. United States, 319 U.S. 372,388-91, 63 S. Ct. 1077, 1086-87, 87 L. Ed. 1458 (1943). Thus, while Lambright dubs the Arizona trial court's use of dual juries an experiment, that does not advance the argument. It says nothing of the efficacy of that experiment or of its reliability.[3] But that is the very point. If the dual jury trial did not make the result unreliable, he can hardly complain.
 
 
 15
 The use of dual juries may have been somewhat more unusual when Lambright's trial took place than it is now, but that is far from saying that it was unreliable. Actually, the use was not all that great an innovation at the time. See Lambright I, 138 Ariz. at 67-70, 673 P.2d at 7-8. At any rate, we now know that dual juries are in wide use and that they have worked out just fine. In fact, we have accepted the use of dual juries in noncapital cases. See Beam v. Paskett , 3F.3d 1301, 1304 (9th Cir. 1993); see also United States v. Sidman, 470 F.2d 1158, 1167-70 (9th Cir. 1972). So have other federal courts. See Mack v. Peters, 80 F.3d 230, 235 (7th Cir. 1996); United States v. Lebron-Gonzalez, 816 F.2d 823, 830-31 (1st Cir. 1987); United States v. Lewis, 716 F.2d 16, 19-20 (D.C. Cir. 1983); United States v. Hayes, 676 F.2d 1359, 1367 (11th Cir. 1982); United States v. Rimar, 558 F.2d 1271, 1273 (6th Cir. 1977); see also People v. Harris, 47 Cal. 3d 1047, 107176, 767 P.2d 619, 633-37, 255 Cal. Rptr. 352, 366-370 (1989). We see no difference in using them in a capital case, and we resile from any suggestion to the contrary in Beam.[4] The issue, again, is not one that should revolve around the fear of novelty; it is, simply, a question of "whether the procedure . . . comports with the basic norm of due process." Lewis, 716 F.2d at 20; see also Chandler, 449 U.S. at 579, 101 S. Ct. at 812.
 
 
 16
 In so stating, we do not denigrate the reflection that death is different from other penalties; it most assuredly is. See Ford v. Wainwright, 477 U.S. 399, 411, 106 S. Ct. 2595, 2602, 91 L. Ed. 2d 335 (1986); Beck v. Alabama , 447 U.S. 625, 637-38, 100 S. Ct. 2382, 2389-90, 65 L. Ed. 2d 392 (1980); Gardner v. Florida, 430 U.S. 349, 357-58, 97 S. Ct. 1197, 1204-05, 51 L. Ed. 2d 393 (1977). Yet, we do not see how that helps Lambright's case because it does not add to his argument that dual juries are unreliable, or that the ones used here were. In fact, his attacks on the particular use here point to possible problems, but do not point to any actual or inevitable harms, or to any particular inaccuracy fostered by dual jury use.
 
 
 17
 Interestingly enough, the harms pointed to by Lambright's generalities are all harms that can conceivably occur in any joint trial, with or without dual juries. In joint trials without dual juries, defense counsel and defendants often wind up at the same counsel table. And jurors know that some evidence can come in against one defendant but not against another one; they often even hear the evidence, but are told to use it as to one defendant only. There might be some rub off. And mistakes might occur. Usually, those factors alone do not even offer grounds for a severance.
 
 
 18
 We have expressed our assessment of those dangers by requiring that "[a] defendant seeking a reversal by reason of a district court's denial of a motion to sever must establish that the prejudice he suffered from the joint trial was so `clear, manifest or undue' that he was denied a fair trial. " United States v. Throckmorton, 87 F.3d 1069, 1071-72 (9th Cir. 1996) (citation omitted). That is even true where the defenses are antagonistic. See id.; see also United States v. Mayfield, No. 98-50100 slip op. 9807, 9817 (9th Cir.Aug. 26,1999). It is also interesting that we have declared that"[i]n assessing whether joinder was prejudicial, of foremost importance is whether the evidence as it relates to the individual defendants is easily compartmentalized . . . . Central to this determination is the trial judge's diligence in instructing the jury on the purpose of the various types of evidence." United States v. Vasquez-Velasco, 15 F.3d 833, 846 (9th Cir. 1994) (citations omitted). But dual juries help assure that very compartmentalization by keeping dangerous evidence away from the ears of the jurors for the defendant to whom it does not apply.[5]
 
 
 19
 Likewise, despite the dangers, the Supreme Court has lauded the benefits of joint trials for they " `play a vital role in the criminal justice system.' " Zafiro v. United States, 506 U.S. 534, 537, 113 S. Ct. 933, 937, 122 L. Ed. 2d 317 (1993) (citation omitted). They "promote efficiency and`serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.' " Id. (citation omitted). Because of that, even where defenses are antagonistic, few cases have been reversed on that ground. See id. at 538, 113 S. Ct. at 937. Rather, an objecting defendant will not be entitled to a severance unless he shows that "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Id. at 539, 113 S. Ct. at 938. We are satisfied that the use of dual juries can actually palliate, rather than exacerbate, the risks of a joint trial. Particularly in a case like this one, where the main reason for a severance was one specific class of evidence, the use of dual juries can capture both the advantages of a joint trial and the protections of separate trials.
 
 
 20
 To put it another way, the problems alluded to in Beam are not endemic to dual jury trials. There we spoke of the additional complexity of a dual jury trial and of the additional likelihood of error. See Beam, 3 F.3d at 1304. Again, however, any joint trial can be as complex or, perhaps, even more complex, and error is just as possible. It is true that problems can develop if the trial (or experiment) is run wrongly, but they are not inherent, or inevitable, in dual juries. For that reason, we upheld the use of dual juries in Sidman , 470 F.2d at 1170, although we said that rules for their use should be established. And even if Beam, 3 F.3d at 1304, were correct in its supposition that the likelihood of error will increase when dual juries are used, that is far from suggesting that an error has occurred. As the Supreme Court has pointed out, if there is a danger of prejudice in some cases, that still does not justify an absolute ban on a procedure. See Chandler, 449 U.S. at 574-75, 101 S. Ct. at 810. And if an error did occur, it could be corrected in the usual way. In most cases, the analysis of that question would be similar to the methods employed in reviewing severance cases. See Mack , 80 F.3d at 235. As it is, no special problems are shown to have developed in the cases at hand.
 
 
 21
 In fine, we cannot agree that any due process right of Lambright or Smith was violated when the Arizona trial court resorted to the use of dual juries, and neither of them has convincingly pointed to some other specific trial right which was compromised by that use.[6]
 
 CONCLUSION
 
 22
 Because there is no per se constitutional error in the use of dual juries, either in general or in this case, and because noother constitutional error developed from their use here, we reject the claims of Lambright and Smith that their convictions must be reversed on those grounds. We overrule any suggestion in Beam that there may be an inevitable constitutional barrier to the use of dual juries in capital cases, experimentally or otherwise. That being said, we need not decide whether a constitutional error would have been structural or would have been subjected to harmless error review. See Brecht v. Abrahamson, 507 U.S. 619, 629-30, 113 S. Ct. 1710, 1717, 123 L. Ed. 2d 353 (1993).
 
 
 23
 In fine, the district court did not err when it rejected those claims, and the illness found by the panel was, therefore, iatrogenic.* We have heretofore withdrawn the panel's opinion, and we now affirm the district court in this respect and return the case to the panel for its consideration of the other issues raised by Lambright and Smith.
 
 
 24
 AFFIRMED in part and returned to the panel.
 
 
 
 Notes:
 
 
 [1]
 See State v. Smith, 138 Ariz. 79, 673 P.2d 17 (Ariz. 1983); State v. Lambright, 138 Ariz. 63, 673 P.2d 1 (Ariz. 1983) (Lambright I). Unless otherwise stated, or clear from context, all references to and holdings regarding Lambright shall include Smith.
 
 
 [2]
 Because we reject the dual jury claim, we need not consider whether accepting it would create a new rule of constitutional law. See Teague v. Lane, 489 U.S. 288, 310, 109 S. Ct. 1060, 1075, 103 L. Ed. 2d 334 (1989). Nor need we consider whether the state has waived application of the Teague doctrine. See Boardman v. Estelle , 957 F.2d 1523, 1534 (9th Cir. 1992).
 
 
 [3]
 Experiment is not defined by the word unreliability. It simply means that we do not necessarily know the outcome at first. But we may -often do -have a very good idea of what the outcome will be. College (even high school) students conduct "experiments" in science classrooms everyday, but the outcome is very predictable if they do the experiment correctly. Nor are even truly new scientific experiments unreliable per se. Rather, they may well turn out to be elegant successes.
 
 
 [4]
 See Beam, 3 F.3d at 1303-04.
 
 
 [5]
 The argument that each defendant's jury will "necessarily speculate" about the evidence being heard by the other defendant's jury is itself rank speculation. See Harris, 47 Cal. 3d at 1072, 767 P.2d at 634, 255 Cal. Rptr. at 367.
 
 
 [6]
 As to the claim of procedural due process violations based on some kind of liberty interest created by Arizona law, nothing that they have pointed to shows, in any way, that the more traditional procedure for determining guilt -use of one jury -conferred any sort of substantive right or guarantee that a single jury deciding Lambright's case would not be working in tandem with Smith's single jury. Absent that demonstration of a substantive end protected by the Arizona procedure, it could not be a deprivation of a liberty interest of some sort when the Arizona Supreme Court determined that while the use of dual juries was error, no harm arose from the use of the procedure in question. In short, absent the creation of some substantive predicate governing decision making, a predicate which did not even arguably arise here, there could be no protected liberty interest. Therefore, no liberty interest was violated. See Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460-63, 109 S. Ct. 1904, 1908-10, 104 L. Ed. 2d 506 (1989); Dix v. County of Shasta, 963 F.2d 1296, 12991301 (9th Cir. 1992); see also Chaney v. Stewart , 156 F.3d 921, 925-26 (9th Cir. 1998); Bonin v. Calderon, 59 F.3d 815, 841-42 (9th Cir. 1995); Moran v. Godinez, 57 F.3d 690, 698 (9th Cir. 1994); Smith v. Sumner, 994 F.2d 1401, 1405 (9th Cir. 1993).
 
 
 *
 Pointed to shows, in any way, that the more traditional procedure for determining guilt -use of one jury -conferred any sort of substantive right or guarantee that a single jury deciding Lambright's case would not be working in tandem with Smith's single jury. Absent that demonstration of a substantive end protected by the Arizona procedure, it could not be a deprivation of a liberty interest of some sort when the Arizona Supreme Court determined that while the use of dual juries was error, no harm arose from the use of the procedure in question. In short, absent the creation of some substantive predicate governing decision making, a predicate which did not even arguably arise here, there could be no protected liberty interest. Therefore, no liberty interest was violated. See Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460-63, 109 S. Ct. 1904, 1908-10, 104 L. Ed. 2d 506 (1989); Dix v. County of Shasta, 963 F.2d 1296, 12991301 (9th Cir. 1992); see also Chaney v. Stewart , 156 F.3d 921, 925-26 (9th Cir. 1998); Bonin v. Calderon, 59 F.3d 815, 841-42 (9th Cir. 1995); Moran v. Godinez, 57 F.3d 690, 698 (9th Cir. 1994); Smith v. Sumner, 994 F.2d 1401, 1405 (9th Cir. 1993).
 
 
 REINHARDT, Circuit Judge, dissenting:
 
 25
 This court, like so many others in this era of diminishing concern for constitutional rights, particularly in capital cases, pays lip service to the idea that "death is different." Meanwhile, it firmly closes its eyes and its mind to the content of that message. The majority tells us, as courts have in so many cases recently, that it is only the end that matters, not the means.
 
 
 26
 Perhaps it is not surprising, when the primary concern of the judiciary is to "get on with" executions, and when even actual innocence is of questionable importance,[1] that this court is willing to approve untested and unauthorized experiments as a means of determining whether capital defendants will live or die. It is not surprising except for the fact that, because "death is different," we are obligated by the Constitution to employ the most reliable methods available to ensure that we arrive at a fair and just verdict. There are tried and true methods of arriving at the truth in our legal system. At the time of Lambright and Smith's capital trial, there was a procedure for conducting capital jury trials that had been approved by the Arizona courts and that was regularly employed in other states as well. That was the single jury system. It had been found, through centuries of use in British and American courts, to be a reliable means of reaching a proper verdict in all trials. Dual juries had not been so tested; nor had such a procedure ever been authorized by Arizona law for use in a capital trial or otherwise.
 
 
 27
 We may, of course, seek to improve the methods that we use to arrive at fair verdicts in criminal trials, but we may not experiment with them in capital cases. Experiments tell us whether a procedure is safe to use -whether it is reliable.When the experimental period is over, if all has gone as we had hoped, we may approve a procedure for use in the future. Often we refine the process during the experimental period, and we grant approval only after the deficiencies are cured. Experimentation entails risks. The experiment may fail, or may be only partially successful. Thus, experiments are not appropriate for use where certainty and reliability are at a premium. It should be obvious to all that a new procedure should be used in a capital case only after it has been determined to be reliable.[2]
 
 
 28
 As the Arizona Supreme Court said, "death penalty cases are inappropriate vehicles for experimentation with new procedures." The majority seems impervious to this elementary concept, and instead affirmatively approves the unauthorized use of an unproven process in a death penalty case. Accordingly, it finds no constitutional error in the lawless judicial conduct that produced the experimental trial in Lambright and Smith's case.
 
 
 29
 To conduct unauthorized experiments in capital cases is to demonstrate a disdain for human life. A system that deems such experiments to be constitutional institutionalizes that disdain and diminishes the Constitution. The majority says that the experiment "worked out just fine" and so concludes, retroactively, that it was all right to try it out on capital defendants. Even assuming that the experiment did work out in general -and that is still a subject for debate -that fact is irrelevant. Human beings on trial for their lives are entitled to more, under our Due Process Clause, than a procedure that may or may not work out "just fine." They are entitled to a trial by a process that the courts have determined to be reliable. When they are denied such a process, they are denied due process of law. If a dual jury procedure or any other reasonable procedure is determined to be a fair and reliable one, following careful experimentation, that procedure may be employed in future capital cases. But, if it has not yet been determined to be reliable, and it is at an experimental, indeed an unauthorized experimental, stage, its use in a capital case does not comport with due process. Simple respect for human life should tell us that.
 
 
 30
 Finally, the majority's bald assertion that the experimental trial caused no problems in Lambright and Smith's case is not supported, and could not be supported, by objective proof. Errors that affect the very nature of the process or, as the Supreme Court calls them, "structural defects in the Constitution of the trial mechanism," are "necessarily unquantifiable and indeterminate." In other words, notwithstanding the majority's facile assurances, the very nature of the error makes it impossible to tell whether everything worked out "just fine" in this unauthorized experimental trial.
 
 
 31
 In the opinion that the court has withdrawn, the panel majority explained these points in greater detail and with appropriate citation to and analysis of the applicable case authority. I set forth the most relevant portions of that opinion below (with all the extensive and detailed footnotes omitted, out of compassion for the reader). I remain fully persuaded that the panel opinion is correct, as does my able colleague, Judge Warren Ferguson, whose dedication to the Constitution provides a model for all to emulate. The panel opinion read in part:
 
 
 32
 Although federal due process protections extend to all state criminal trials, the Supreme Court has demanded an even higher degree of procedural regularity and reliability in capital cases. The heightened requirement of proceduralregularity and reliability derives from the longstanding recognition that:
 
 
 33
 death is a different kind of punishment from any other which may be imposed in this country . . . . From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action in taking the life of one of its citizens also differs dramati cally from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.
 
 
 34
 Gardner v. Florida, 430 U.S. 349, 357-58; see also Ford v. Wainwright, 477 U.S. 399, 411 (1986) (plu rality opinion) ("In capital proceedings generally, this Court has demanded that fact finding procedures aspire to a heightened standard of reliability . . .. This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties . . . .")
 
 
 35
 Indeed, in numerous opinions, the Supreme Court has held that the death penalty may be imposed only following rigidly regular and reliable sentencing pro cedures. The Court has therefore dictated the discre tion that sentencing courts and juries must have. See, e.g., Lockett v. Ohio, 438 U.S. 586 (1978); Godfrey v. Georgia, 446 U.S. 420 (1980). Courts are required to scrutinize the wording of jury instructions. See, e.g., Caldwell v. Mississippi, 472 U.S. 320 (1985); Mills v. Maryland, 486 U.S. 367 (1988). They must, moreover, set strict guidelines for the type of evi dence that may be admitted, must be admitted, and may not be admitted. See, e.g., Skipper v. South Carolina, 476 U.S. 1 (1986); Booth v. Maryland, 482 U.S. 496 (1987).
 
 
 36
 In Beck v. Alabama, the Supreme Court made explicit the obvious point that similar concerns and heightened protections extend to the guilt phase of capital trials. The Beck Court held that the federal Due Process Clause requires lesser included offense instructions in all capital trials, although it reserved the question of whether due process requires such instructions in noncapital cases. The Court con cluded that "[t]o insure that the death penalty is indeed imposed on the basis of `reason rather than caprice or emotion,' we have invalidated procedural rules that tended to diminish the reliability of the sentencing determination. That same reasoning must apply to rules that diminish the reliability of the guilt determination." Beck, 447 U.S. at 637-38 (internal citations omitted).
 
 
 37
 This court has also emphasized the higher level of procedural reliability demanded of capital trials. In Beam v. Paskett, 3 F.3d 1301 (1993), a case in which we examined the authorized use of dual juries, we stressed the heightened procedural requirements of capital cases. We wrote that cases that result in the imposition of the death penalty require "exacting constitutional scrutiny." Id. at 1303-04. We also held that "the level of constitutional scrutiny given to the state's use of a dual jury procedure is determined by the nature of the punishment the defendant will actu ally suffer . . . . Whatever additional constitutional constraints exist on the use of dual juries in capital trials would be a consequence of the greater reliabil ity demanded of verdicts upon which a sentence of death is based . . . ." Id. at 1304. In expressing its own disapproval of the trial judge's use of dual juries in Lambright's and Smith's trial, the Arizona Supreme Court wrote that "death penalty cases are inappropriate vehicles for experimentation with new procedures." State v. Lambright, 673 P.2d 1, 8 (Ariz. 1983).
 
 
 38
 States may, of course, "experiment" with new pro cedures designed to improve thetrial process. Indeed, the ability of states to serve as "laboratories" has long been heralded as one of the "happy incidents" of our federal system. See New State Ice Co. v. Liebmann, 285 U.S. 262, 280 (1932) (Brandeis, J., dissenting); see also Arizona v. Evans, 514 U.S. 1, 8 (1995) (citing New State Ice Co., 285 U.S. at 280).
 
 
 39
 Perhaps the most well-known endorsement of state court "experimentation" with trial procedures came in Chandler v. Florida, 449 U.S. 560 (1981), where the Court held that a state could provide for electronic media coverage of criminal trials. While the Court approved of Florida's "experimentation" with the use of cameras in the criminal courtroom, before granting its approval the Court explained in great detail the procedures by which Florida had authorized the experiment. Id. at 803-05. Several television stations petitioned the Supreme Court of Florida to change Florida's Canon of Judicial Ethics 3A(7), which proscribed television coverage of courtroom proceedings. Only after the Florida Supreme Court had "invited presentations in the nature of a rulemaking proceeding" did it allow the televising of one civil and one criminal trial, under specific guidelines. The state supreme court then:
 
 
 40
 received and reviewed briefs, reports, let ters of comment, and studies. It conducted its own survey of attorneys, witnesses, jurors, and court personnel . . . . A separate survey was taken of judges by the Florida Conference of Circuit Judges. The court also studied the experience of 6 States that had, by 1979, adopted rules relating to electronic coverage of trials, as well as that of 10 other States that, like Florida, were experimenting with such coverage.
 
 
 41
 Id. 564, 101 S.Ct. at 805. Following this extensive period of review the Florida Supreme Court concluded that "on balance there [was] more to be gained than lost by permitting electronic media coverage of judicial proceedings subject to standards for such coverage." Id. (quoting In re Petition of Post-Newsweek Stations, Florida, Inc., 370 So.2d 764, 780 (1979)).
 
 
 42
 When states carefully consider the impact of new techniques and procedures on a criminal trial, they may, within limits, authorize experimentation with those techniques. Because Florida engaged in such reasoned consideration of the impact that television would have on trials, the United States Supreme Court approved the experiment. This obviously does not imply, however, that individual state trial judges have free reign to experiment with the central elements of the historic trial structure when the state itself has not considered whether to authorize its judges to do so. To allow this type of unauthorized experimentation in a capital case would be to allow individual judges to determine the quality of process each capital defendant would receive. Our constitution guarantees "due process" to prevent exactly this.
 
 
 43
 Before carrying out an experiment with the fundamental elements of the criminal process, a state must proceed cautiously. It must give due consideration to the potential impact of the procedural innovation. In 1982, Arizona did have a set of rules for the authori zation of new criminal procedures. Trial courts had the authority to propose changes, but could not implement them without first securing the approval of the Arizona Supreme Court. As the court stated in this very case:
 
 
 44
 Nothing we say here should discourage courts, through the adoption of local rules, to carry out experiments which may improve the judicial process. Indeed, these efforts should be encouraged. But local rules must first be approved by this court.
 
 
 45
 Lambright, 673 P.2d at 7 (emphasis added).
 
 
 46
 The trial judge in this case did not take the steps Arizona required for the authorization of experimental trial procedures. Instead, he simply decided unilaterally that two defendants would be tried, in a capital case, in an experimental proceedingthat he, himself, designed. Nothing Justice Brandeis ever said about the virtue of states as laboratories comes close to sanctioning this type of unguided experiment. In a capital case where procedural protections are heightened and courts engage in "exacting constitutional scrutiny," Beam, 3 F.3d at 1303-04, a trial judge simply may not design his own criminal procedures. Where he does so, the Due Process Clause of the Fourteenth Amendment is violated.
 
 
 47
 * * *
 
 
 48
 Having determined that the unauthorized experimentation conducted by the trial judge in this case constitutes a due process violation, our next task is to determine what type of error -trial or structural -results from the use of an unauthorized, experimental jury system. Structural errors are those that affect "the framework within which the trial proceeds." Arizona v. Fulminante, 499 U.S. 279, 309 (1991). They are "structural defects in the constitution of the trial mechanism, which defy analysis by `harmless error' standards," id., and "affect the trial from beginning to end." Rice v. Wood, 77 F.3d 1138, 1141 (9th Cir. 1996). Trial errors, on the other hand, are generally errors that occur "during the presentation of the case to the jury, and that may therefore be quantitatively assessed in the context of other evidence presented." Id. at 307-08. Trial errors, unlike structural errors, are subject to harmless error analysis. We have held that "[t]he purpose of harmless error analysis is to avoid setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." United States v. Annigoni, 96 F.3d 1132, 1143 (9th Cir. 1996)(internal citations omitted).
 
 
 49
 Our determination of what type of error occurred here, where the trial judge impermissibly experimented with the jury structure, is aided by the Supreme Court's decision in Sullivan v. Louisiana, 508 U.S. 275 (1993). In Sullivan, the Court held that a jury instruction that erroneously defined the reasonable doubt standard effectively deprived the defendant of his right to a jury trial. The Court first distinguished "structural defects in the constitution of the trial mechanism," from "errors which occur during the presentation of the case to the jury. " Id. at 282 (internal citations omitted). It then held that an erroneous reasonable doubt instruction constitutes structural error, writing:
 
 
 50
 [T]he jury guarantee [is] a `basic protection' whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function. The right to trial by jury reflects, we have said, a `profound judgment about the way in which law should be enforced and justice administered.' The deprivation of that right, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as `structural error.'
 
 
 51
 Sullivan, 508 U.S. at 282 (internal citations omitted).
 
 
 52
 It is, indeed, hard to imagine an error more starkly structural than an error implicating the very design of the jury mechanism. When, as here, a judge impanels an unauthorized and experimental jury sys tem, he commits an error of this type. The conse quences of such an error are, as the Sullivan Court wrote, "necessarily unquantifiable and indeterminate." Id. Such an error, moreover, quite obviously amounts to an error in the "constitution of the trial mechanism," that affects "the framework within which the trial proceeds." Fulminante, 499 U.S. at 309. We hold, therefore, that an error in the fundamental design of the jury mechanism "unquestionably qualifies as structural error. " Id.
 
 
 53
 It is well settled that structural errors are not subject to harmless error review. See, e.g. Brecht v. Abrahamson, 507 U.S. 619, 629 (1993); Sullivan, 502 U.S. at 380; Arizona v. Fulminante, 499 U.S. 279, 309(1991). This is true even on federal habeas review of state convictions. See Crandell v. Bunnell, 144 F.3d 1213, 1216 (9th Cir. 1998); Bland v. California Dep't of Corrections, 20 F.3d 1469, 1477 (9th Cir. 1994) (citing Brecht, 507 U.S. at 629-30). Where a structural error occurs at trial, an appeals court does not conduct a harmless error review. Nor do we look for a specific showing of prejudice. As the Supreme Court has held, "[t]he existence of such defects . . . requires automatic reversal of the conviction because they infect the entire trial process." Brecht, 507 U.S. at 629-30 (citing Fulminante, 499 U.S. at 309-10).
 
 
 54
 Because the use of dual juries at Lambright and Smith's trial constituted structural error, we reverse petitioners' convictions.
 
 
 
 Notes:
 
 
 [1]
 See Graham v. Johnson, 168 F.3d 762, 788 (5th Cir. 1999) ("[T]his court has rejected a claim such as that made by Graham that the execution of an innocent person, even where no constitutional violation has taken place, contravenes the Fifth, Eighth, and Fourteenth Amendments.")
 
 
 [2]
 It is not Lambright, incidentally, who "dubs the Arizona trial court's use of dual juries an experiment" as the majority states. It is the Arizona Supreme Court that "dubbed" a/k/a "held " the use of dual juries to be an "experiment," and an "unauthorized" one at that. The Arizona Supreme Court concluded that "[i]t is clear that the`experiment' conducted in the instant case was unauthorized . . . ." Arizona v. Lambright, 673 P.2d 1, 7 (Ariz. 1983).