Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ROBERT CHARLES COMER,
            *Petitioner-Appellant,*

v.

DORA B. SCHRIRO, Director, of
Arizona Department of
Corrections,
            *Respondent-Appellee.*

No. 98-99003

D.C. No.
CV-94-01469-ROS

OPINION

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Argued and Submitted
May 17, 2005—Pasadena, California

Filed September 13, 2006

Before: Harry Pregerson, Warren J. Ferguson, and
Pamela Ann Rymer, Circuit Judges.

Opinion by Judge Ferguson;
Partial Concurrence and Partial Dissent by Judge Rymer

11115

## COUNSEL

Denise I. Young, Tucson, Arizona; Julie S. Hall, Tucson, Arizona, for the petitioner-appellant.

Michael D. Kimerer, Phoenix, Arizona; Holly R. Gieszl, Phoenix, Arizona, special counsel for petitioner-appellant.

John Pressley Todd, Assistant Attorney General, Phoenix, Arizona, for the respondent-appellee.

## OPINION

FERGUSON, Circuit Judge:

Arizona death row prisoner, Robert Charles Comer ("Comer"), appealed the District Court's denial of his 28 U.S.C. § 2254 habeas petition challenging his conviction and capital sentence for first degree murder, armed robbery, kidnapping, aggravated assault, sexual assault, and sexual abuse. Before Comer's appeal could be heard, however, the State of

Arizona (the "State") and Comer filed motions to dismiss the appeal because Comer expressed his desire to be executed. On remand from this Court, the District Court held an evidentiary hearing and found Comer to have competently and voluntarily waived his habeas appeal right. Habeas Counsel now challenges that determination on appeal.

We agree with the District Court that Comer competently and voluntarily waived his habeas appeal right. By upholding Comer's waiver, however, we would be permitting the State to execute Comer without any meaningful appellate review of his previously filed federal habeas claims, which would amount to a violation of the Eighth Amendment to the U.S. Constitution. We therefore deny the State's and Comer's motions to dismiss the appeal and proceed to review the District Court's denial of Comer's federal habeas petition.

We hold that Comer's sentence was invalid and hereby grant the writ of habeas corpus based on the violation of Comer's due process rights that occurred when he was sentenced to death while nearly naked, bleeding, shackled, and exhausted.

## I.   FACTUAL AND PROCEDURAL BACKGROUND[1]

*Crime*

The facts of this case are deeply disturbing. Comer, his companion Juneva Willis ("Willis"), and Willis's two children arrived at the Burnt Corral campground in Apache Lake, Arizona on February 2, 1987. The next evening, Comer invited a nearby camper, Larry Pritchard, to dine with him and Willis, and, after the meal, Comer shot him in the head. It is unclear whether Pritchard died immediately from the

---

[1]The facts related to Comer's crime, charges, and conviction are largely taken from the Supreme Court of Arizona's 1990 decision in this case. *See State v. Comer*, 799 P.2d 333, 336-38 (Ariz. 1990).

gunshot wound or later on. Comer later stabbed him in the neck. Comer then removed an Emergency Medical Technician ("EMT") badge from Pritchard's pocket, and Willis hid Pritchard's body by covering it with wood. After the murder, Comer and Willis drove to Pritchard's campsite, where they stole a number of Pritchard's belongings, as well as his dog.

Comer and Willis then proceeded to the campsite of Jane Jones and Richard Smith, campers whom they had met earlier that day. Remembering from their earlier encounter that Jones and Smith were in possession of a small quantity of marijuana, Comer and Willis posed as "Arizona Drug Enforcement" officers, and ordered them out of their tent at gunpoint. Comer flashed the EMT badge and then tied up Jones and Smith with wire and duct tape. He put them in their truck and stole several items from their tent.

Comer then drove Jones's and Smith's truck, while Willis followed behind in his. After a short time, Willis stopped following Comer. When Jones asked to relieve herself, Comer permitted her to do so but accompanied her into the woods and sexually assaulted her. He then sexually assaulted her again in front of the truck. Comer threatened to kill Smith but Jones convinced him not to do so. Comer instead left Smith in the woods and drove off with Jones. When the truck ran out of gas, Comer and Jones walked back to Willis, and the three of them then drove together, along with Willis's two children. During this journey, Comer shot and killed Pritchard's dog, and sexually abused Jones twice more.

Jones managed to escape while Comer was fixing his truck. She was later picked up by a passing motorist and taken to the sheriff's home. Smith, too, had managed to walk back to the Burnt Corral campground and had reported the incident to the Department of Public Safety. The police quickly apprehended Comer and Willis.

*Charges*

Comer and Willis were charged in Maricopa County with the first degree murder and armed robbery of Pritchard and the armed robbery, kidnapping, and aggravated assault of Jones and Smith. In addition, Comer was charged with two counts of sexual abuse and three counts of sexual assault of Jones. Willis subsequently pled guilty to one count of kidnapping in exchange for agreeing to testify against Comer. The other charges against her were dropped.

*Convictions and Sentence*

Comer was absent from the courtroom throughout his 1988 state trial for capital murder. After seven days of hearing evidence, a jury found Comer guilty on all counts.

Comer was physically present in the courtroom for the first time on the day of his sentencing. He was shackled to a wheelchair and, except for a cloth draped over his genitals, he was naked. His body was slumped to one side and his head drooped toward his shoulder. He had visible abrasions on his body. After asking both the court deputy and a prison psychiatrist whether Comer was conscious, the state trial judge sentenced him to death for the murder of Pritchard and to aggravated, consecutive terms of imprisonment for the other offenses.

On direct appeal, the Arizona Supreme Court affirmed the convictions and sentence. *Comer*, 799 P.2d at 350.

*State Post-Conviction Relief*

On October 24, 1991, Comer filed a petition for post-conviction relief in state court challenging the constitutionality of his conviction and sentence. On November 10, 1992, the superior court denied the petition on the ground that Comer's claims were largely precluded and waived. The Ari-

zona Supreme Court denied the petition for review on September 21, 1993, and the U.S. Supreme Court denied the petition for certiorari on April 4, 1994.

*Federal Habeas Corpus Petition*

On July 19, 1994, Comer filed a federal habeas corpus petition with the District Court of Arizona. He later filed an amended petition on March 16, 1995.[2] On August 2, 1996, the District Court found that Comer had procedurally defaulted on all his habeas claims except Claims I, II, III(A), III(B)(1), III(C) (in part), V(A), V(B), XIII, XX(C)(4), and XX(D), which largely concerned errors at trial and ineffective assistance of defense counsel.[3] The District Court considered the merits of these claims and, on November 20, 1997, denied Comer's habeas petition.

*Appeal to this Court*

On February 18, 1998, Comer filed a timely notice of

---

[2]While Comer's habeas petition was pending, he filed a second petition for state post-conviction relief in state court challenging the constitutionality of his conviction and sentence. On September 22, 1998, the state trial court denied the petition on the ground that Comer's claims were procedurally precluded, and on December 6, 1999, the Arizona Supreme Court denied review.

[3]Specifically, these claims were: (1) the trial court's failure and refusal to sever counts (Claims I and II), (2) the prosecutor's misconduct in repeating the use of dehumanizing epithets to characterize Comer (Claim III(A)), (3) the prosecutor's misconduct in using invective during closing argument (Claim III(B)(1)), (4) the prosecutor's misrepresentation of law and facts during closing argument (Claim III(C)), (5) the trial court's failure to strike two jurors for cause (Claim V(A)), (6) the trial court's error in impairing Comer's exercise of peremptory challenges (Claim V(B)), (7) the Arizona Supreme Court's finding of "helplessness of the victim" as an aggravating factor for sentencing (Claim XIII), (8) defense counsel's failure to undertake an adequate mitigation investigation (Claim XX(C)(4)), and (9) appellate counsel's failure to raise on appeal any issue raised in Comer's habeas petition (Claim XX(D)).

appeal to the Ninth Circuit challenging the District Court's denial of his habeas petition. This Court has jurisdiction to hear Comer's appeal pursuant to 28 U.S.C. § 2253.

*Intervening Motion to Dismiss Appeal*

After filing his appeal, Comer sent letters to the State Attorney General and to the state trial judge stating that he no longer wanted his appeal to be heard and expressing his desire to die. In light of these letters, the State moved to dismiss Comer's appeal contending that this Court lacked jurisdiction to determine any aspect of the case. Comer himself also filed a pro se motion to dismiss his appeal. Comer's originally appointed counsel — now Habeas Counsel — opposed both the State's and Comer's motions and asked this Court to order a procedure to determine the validity of Comer's appeal. On September 18, 2000, the District Court appointed Special Counsel to represent Comer concerning his decision to end his appeals and proceed to execution.

*Evidentiary Hearing*

This Court subsequently decided to vacate the date for oral argument on the merits of Comer's appeal and held the motion to dismiss Comer's appeal in abeyance until the District Court held an evidentiary hearing on the separate questions of whether Comer was competent to terminate representation by counsel and waive legal review and, if so, whether his conditions of confinement rendered those decisions voluntary. *Comer v. Stewart*, 215 F.3d 910 (9th Cir. 2000).

Pursuant to our order, the District Court conducted an evidentiary hearing in March 2002. Following extensive discovery and a three-day hearing, the District Court found in a 90-page opinion that Comer was competent to waive his habeas appeal right and that his waiver was made voluntarily. Habeas Counsel appealed the District Court's judgment to this Court.

We delayed issuing a briefing schedule until the Supreme Court decided *Schriro v. Summerlin*, 542 U.S. 348 (2004) (holding that *Ring v. Arizona*, 536 U.S. 584 (2002), did not apply retroactively to cases already final on direct review).

## II.  DISCUSSION

### A.  *The Waiver's Validity*

#### 1.  *Background*

We asked the District Court to hold an evidentiary hearing to determine whether Comer competently waived his habeas appeal right. Pursuant to our order, the District Court suggested to both parties that a neutral expert evaluator be appointed to assess Comer's competency at the time he waived his habeas appeal right, and that the parties confer and suggest candidates. The District Court allowed both parties to have access to every place Comer had lived while incarcerated. The parties submitted proposed findings of fact and conclusions of law, and both parties were allowed to object to each other's proposed findings and conclusions. The District Court thus ostensibly undertook comprehensive steps to ensure an adequate factual determination of Comer's competency at the time he waived his habeas appeal right.

The question before the District Court was whether, giving full and fair consideration to all of the evidence, it could be established by a preponderance of the evidence that Comer is competent to waive further legal review of his convictions and sentences. Specifically, we directed the District Court to determine "whether [Comer] has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Comer*, 215 F.3d at 917 (quoting *Rees v. Peyton*, 384 U.S.

312, 314 (1966) (per curiam)).[4] In arriving at this determina-
tion, the District Court reviewed evaluations, reports, testi-
mony from two psychiatrists and one psychologist, Comer's
personal background, and other witness testimony and exhib-
its to conclude that Comer did not suffer from mental disease
or defect. *See Comer*, 230 F. Supp. 2d at 1061.

## 2. *Analysis*

### a. *Competency*

The District Court's determination as to whether Comer
was competent to waive his habeas appeal right is a strictly
factual one that we accept unless clearly erroneous. *Massie ex
rel. Kroll v. Woodford*, 244 F.3d 1192, 1194 (9th Cir. 2001)

---

[4]As the District Court noted, the three-part *Rees* test to determine the
capacity of an inmate to make a waiver decision has been simplified as
follows by the Fifth Circuit in *Rumbaugh v. Procunier*, 753 F.2d 395, 398-
99 (5th Cir. 1985):

> (1) Is the person suffering from a mental disease or defect?
>
> (2) If the person is suffering from a mental disease or defect,
> does that disease or defect prevent him from understanding his
> legal position and the options available to him?
>
> (3) If the person is suffering from a mental disease or defect
> which does not prevent him from understanding his legal position
> and the options available to him, does the disease or defect, nev-
> ertheless, prevent him from making a rational choice among his
> options?
>
> If the answer to the first question is no, the court need go no
> further, the person is competent. If both the first and second ques-
> tions are answered in the affirmative, the person is incompetent
> and the third question need not be addressed. If the first question
> is answered yes and the second question is answered no, the third
> question is determinative; if yes, the person is incompetent, and
> if no, the person is competent.

*Comer*, 230 F. Supp. 2d 1016, 1036-37 (quoting *Rumbaugh*, 753 F.2d at
398-99); *accord Lonchar v. Zant*, 978 F.2d 637, 641-42 (11th Cir. 1992);
*Ford v. Haley*, 195 F.3d 603, 615 (11th Cir. 1999).

(citing *Demosthenes v. Baal*, 495 U.S. 731, 735 (1990)). The District Court rendered several preliminary determinations to come to its conclusion that Comer was competent when he waived his habeas appeal right. We analyze each preliminary determination here briefly to assess whether or not it was clearly erroneous.

**[1]** First, the District Court determined that its own court-appointed expert, Dr. Sally Johnson, was significantly more qualified to render a competency opinion than Habeas Counsel's expert, Dr. Terry Krupers. *Comer*, 230 F. Supp. 2d at 1039. The Court based this determination on evidence as to the experts' qualifications, in particular on the fact that, unlike Dr. Johnson, Dr. Krupers had never engaged in a forensic evaluation to determine the competency of an inmate to be executed nor previously conducted a forensic evaluation of an inmate sentenced to death who wanted to dismiss his appeal. *Id.* Moreover, the Court found Dr. Johnson's investigation to be thorough and her questions especially relevant. *Id.* at 1040. Given the clear difference in expert qualifications between Dr. Johnson and Dr. Krupers, as well as Dr. Johnson's relatively superior investigation, the Court did not clearly err in affording greater weight to Dr. Johnson's opinions.

**[2]** Second, the District Court determined that Comer did not suffer from Major Depressive Disorder. The Court based this determination on the accuracy of Dr. Johnson's differential diagnoses of Comer's various apparent depressive episodes. Specifically, with respect to Comer's first apparent depressive episode in May 1999, the Court found as credible Dr. Johnson's attempt to distinguish the differential diagnosis of bereavement from the symptoms that Dr. Krupers attributed to a major depressive episode. *See id.* at 1042-43. With respect to Comer's second apparent depressive episode in Spring 2001, the Court found as credible Dr. Johnson's attempt to distinguish the differential diagnosis of a general medical condition from the symptoms that Dr. Krupers attributed to a second major depressive episode. *See id.* at 1043-

44. Finally, with respect to Comer's apparent bouts of depression between his two purported episodes, the Court found as credible Dr. Johnson's explanation that Comer sought attention by narrating his feelings and that he did not deny his symptoms of depression, as Dr. Krupers had argued. *See id.* at 1047-48. Given the failure of Dr. Krupers to assess possible differential diagnoses for Comer's apparent depressive episodes, and the confidence with which Dr. Johnson attested to such diagnoses, the District Court did not clearly err in concluding that Comer did not suffer from Major Depressive Disorder.

[3] Third, the District Court determined that Comer did not suffer from Post-Traumatic Stress Disorder ("PTSD"). The Court based this determination on Dr. Krupers's inability to apply accurately the DSM-IV criteria for PTSD.[5] In particular, the Court questioned Dr. Krupers's failure to identify credible evidence with respect to the third group of PTSD symptoms related to "increased arousal." *Id.* at 1052. According to the Court, Dr. Krupers needed to establish with sufficient certainty that Comer suffered from two or more of the following symptoms related to "increased arousal": (1) difficulty falling or staying asleep; (2) irritability or outbursts of anger; (3) difficulty concentrating; (4) hypervigilance; and (5) exaggerated startle response. *Id.* Dr. Krupers, however, merely speculated that "most prisoners in [Comer's] situation" would have diffi-

---

[5]The District Court noted that

> [a]part from some traumatic experience, the DSM-IV describes three groups of symptoms for PTSD, and one or more of each group must be suffered by the patient to establish a diagnosis of PTSD. The first group of symptoms is that the patient is 'persistently reexperienc[ing]' the traumatic event in at least one of various specific ways[, including recurring or severe] 'flashbacks' and 'nightmares' . . . . The second group of symptoms . . . require that a patient '[p]ersistent[ly] avoid[s] stimuli associated with the trauma.' . . . [The third group of] symptoms [requires] that the person experiences 'increased arousal' not present before trauma.

*Comer*, 230 F. Supp. 2d at 1051-52 (citations omitted)

culty falling asleep and failed to rebut Dr. Johnson's and Comer's testimony as to factors (4) and (5). *Id.* While it is unclear from the Court's opinion just how narrowly the DSM-IV criteria for PTSD are defined, the District Court did not clearly err in dismissing as unspecific Dr. Krupers's factual applications of the criteria to Comer's symptoms.

[4] Lastly, the District Court determined that Comer did not suffer from Segregated Housing Unit ("SHU") syndrome. The Court based this determination on Dr. Johnson's and Comer's testimony contradicting Dr. Krupers's findings concerning SHU syndrome. *Id.* at 1057. The Court identified and accepted the following characteristic symptoms of SHU syndrome: massive free-floating anxiety, hyperresponsiveness, derealization, difficulty with concentration and memory, acute confusional states, ideas of reference and persecutory idealation (paranoia), and compulsion. *Id.* at 1056. The Court then affirmed Dr. Johnson's findings that Comer did not exhibit these symptoms at all or at least not to the level necessary to make an adequate showing of SHU. *See id.* at 1057.

Of particular importance to the District Court was Dr. Johnson's prior work with patients in segregated housing units and the fact that Comer's own testimony did not corroborate Dr. Krupers's findings. *Id.* Even though Dr. Krupers was qualified to offer his opinion on the disorder, he did not have prior experience in diagnosing or treating inmates who suffered from SHU syndrome in the way that Dr. Johnson had.[6] While this fact alone does not render Dr. Johnson's findings more accurate than Dr. Krupers's, it does make it more difficult to find the Court's determination that Comer did not have SHU syndrome to be clearly erroneous, particularly since there are no rigorous DSM-IV criteria for diagnosing SHU syndrome. *See id.* at 1055.

---

[6]Cross-examination of Dr. Krupers included the following exchange: "Q: Doctor, do you treat inmates in prison who suffer from what you term SHU syndrome? A: No, I don't."

In sum, the District Court's preliminary determinations are not clearly erroneous, demonstrating that the Court did not clearly err in determining that Comer competently waived his habeas appeal right.

b. *Voluntariness*

We review de novo the District Court's determination that Comer voluntarily waived his habeas appeal right. *See United States v. Amano*, 229 F.3d 801, 803 (9th Cir. 2000).

We directed the District Court to determine "whether [Comer's] purported decision [to waive further legal review] is voluntary" and "whether [Comer's] conditions of confinement constitute punishment so harsh that he has been forced to abandon a natural desire to live." *Comer*, 215 F.3d at 917. The District Court determined that Comer's waiver was voluntary and that the conditions of his confinement "have not had a substantial effect nor have they rendered his decision involuntary." *Comer*, 230 F. Supp. 2d at 1071.

[5] We previously summarized the legal standard to determine voluntariness of waiver:

> The Supreme Court has held that a waiver of a petitioner's "right to proceed" is not valid unless, among other factors, it is "knowing, intelligent, *and voluntary*." *Whitmore v. Arkansas*, 495 U.S. 149, 165 (1990) (emphasis added). "A waiver is voluntary if, under the totality of circumstances, [it] was the product of a free and deliberate choice rather than coercion or improper inducement." *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998). Put differently, a decision is involuntary if it stems from coercion — either mental or physical. *See, e.g., Brady v. United States*, 397 U.S. 742, 754 (1970). Indeed, courts have recognized that a decision to waive the right to pursue legal remedies is involuntary if it results from

duress, including conditions of confinement. *See, e.g., Smith v. Armontrout*, 812 F.2d 1050, 1058-59 (8th Cir. 1987) (reviewing for error the district court's determination on whether petitioner's particular conditions of confinement rendered his decision to waive appeals involuntary); . . . *Grossclose ex rel. Harries v. Dutton*, 594 F. Supp. 949, 961 (M.D. Tenn. 1984) ("In the judgment of this Court, the conditions of confinement inflicted on Mr. Harries are so adverse that they have caused him to waive his post-conviction remedies involuntarily").

*Comer*, 215 F.3d at 917-18.

**[6]** From the record, it is clear that Comer's waiver was a "product of a free and deliberate choice." *Doe*, 155 F.3d at 1074. At the evidentiary hearing, Comer clearly expressed his willingness to withdraw his appeal in spite of the fact that Habeas Counsel informed him that his appeal had a strong prospect of success ("Julie [Hall] came down and said I had some real good merits in my case and that we were in the Ninth Circuit."). Special Counsel fully informed Comer that he could possibly receive a new sentence or a new trial, or even be found not guilty, if his appeal were to be heard.[7] Spe-

---

**7** [Special Counsel]: You've heard and we've talked a lot about what could happen if your habeas is considered by the appellate courts. And I think you have said that you believe, from everything you've been told and everything that you've read, that you have a good — good prospects for a new sentencing. Right?

[Comer]: Yes, ma'am.

[Special Counsel]: So that would mean — if you got a new — another sentencing, do you understand, then, that you may not get the death penalty?

[Comer]: Yes, ma'am.

[Special Counsel]: And you may even get a new trial.

[Comer]: Yes.

cial Counsel further informed Comer that it would be much tougher for the State to retry him because of the amount of delay in the proceedings.[8] Moreover, Special Counsel informed Comer that he would not be able to change his mind once he waived his habeas appeal ("[Special Counsel]: Do you understand that if you are allowed to drop your appeal that you may not be allowed to reinstate it afterwards if you

---

[Special Counsel]: You could — you could have a not guilty verdict in your favor and you'd be out on the street, right?

[Comer]: No.

[Special Counsel]: Why not?

[Comer]: I wouldn't put all the people through another trial. I'd just go up there, plead guilty. . . . There's no sense to it. That's what I mean. I've already been lawfully convicted.

[8] [Special Counsel]: You understand that if the government were to try this case 13 years later or by the time this decision is made, habeas decision is made, and if it was made in your favor, that there would be enormous amount of delay in the proceedings before they tried you?

[Comer]: It could be, yes, ma'am.

[Special Counsel]: And you understand that memories fade over that long period of time and the government —

[Comer]: Yes, ma'am.

[Special Counsel]: — it's often much harder for the government to prove their case.

[Comer]: Yes, ma'am.

[Special Counsel]: — the second time? And that evidence could be destroyed and witnesses could disappear or could die?

[Comer]: Yes.

[Special Counsel]: And those witnesses who were vital in your trial — and you remember your trial.

[Comer]: Yes.

[Special Counsel]: — may not be around.

[Comer]: That's quite possible.

change your mind? [Comer]: Yes, sir"). Perhaps most significantly, the District Court itself made clear to Comer that his decision to waive his appeal was his own and would necessarily result in his death.[9] Despite all this, Comer repeatedly stressed how he understood the significance and consequences of withdrawing his appeal, and nevertheless wanted to do so. *See, e.g.*, ("I, in my heart, have not appealed [the denial of my habeas petition]. I never appealed any of this.").

From the record, it is also clear that Comer's waiver was not "improper[ly] induced" based on the conditions of his confinement. *Doe*, 155 F.3d at 1074. First, Comer's own violent actions in prison have contributed to his continued confinement in restrictive conditions. Both Dr. Johnson's and Dr. Krupers's clinical evaluations make this apparent. Dr. Johnson reports:

> Review of Mr. Comer's behavioral infractions (incident reports) over the last 13 years shows numerous

---

[9] [District Court]: And do you also understand that the decision that you [Comer] have made and you have asked this Court to carry out, at least at my level, is the one — one decision which is most fundamental to all human beings, and that's to end your life.

[Comer]: Yes, ma'am.

[District Court]: You understand that?

[Comer]: Yes, ma'am, I do.

[District Court]: At least that's considered to be the most fundamental decision that anyone can make in this country. You understand that?

[Comer]: Yes, ma'am.

[District Court]: And it's embodied in the Constitution. You find it throughout the Constitution. And we all have an obligation to ensure that nobody does that unless they have fully understood the consequences. You understand?

[Comer]: Yes, ma'am.

major and minor violations. He had approximately a dozen violations for possession and manufacture of a weapon. In almost all cases this involved the making of shanks or knives. On at least two occasions he set fires in his cell . . . . He had several violations for destruction of property or tampering with equipment . . . . On one occasion he was involved in an actual attempted assault on another individual (another inmate).

[Comer] has gradually, as the result of his behavior, developed a reputation within the Arizona DOC as being their highest security risk and most dangerous inmate. His intermittent manufacture of weapons and periodic impulsive verbal responses that are perceived as threatening, make it unlikely that he would succeed in changing the perception of the DOC about his degree of dangerousness in the foreseeable future. He personally verbalizes his own opinion that the extra security precautions are warranted in his case and takes some enjoyment in persistently attempting to succeed in circumventing security interventions made by the DOC.

Dr. Krupers reports:

Mr. Comer feels compelled, as a symptom of his mental disorder, to continually manufacture [metal] shanks; his doing so gives the DOC a rationale for requiring he live in ever more restrictive conditions; and the extremity of his conditions of confinement in turn exacerbate the mental disorder that is reflected (in part) in the compulsion to manufacture shanks . . . . [Comer's] psychologically compelled behaviors, to wit shank-manufacturing and threatening staff, prevent him from gaining even modest improvements in his actual conditions of confinement.

Based on Comer's own willful and violent actions, it is difficult to see how the State acted improperly in placing him in maximum confinement and, more importantly, how his conditions of confinement have improperly coerced him into waiving his appeal.

Second, the conditions of Comer's confinement in the Arizona Department of Corrections (ADOC) Special Management Unit (SMU) II, while certainly harsh, are no more restrictive than the conditions of his confinement in SMU I and California's Folsom Prison,[10] nor are they unique to Comer. Comer himself estimates that his one-person prison cell in SMU II is twice as large as his two-person cell in Folsom ("[I]f you took my cell right now and cut it in half, it would still be bigger than our cells at Folsom, and at Folsom we had two people sitting in there"). He further notes that SMU II is more clean, easier to see in and out of, quieter, and less dangerous than Folsom or SMU I. SMU II is "heaven" compared to "Folsom" with "much nicer . . . conditions of confinement."[11] Comer references how other inmates were confined in "supermax units" at SMU II and how they posed equally as high a security risk as Comer. He defines his conditions of confinement in the context of what he and his fellow inmate, Robert Wayne Vickers ("Bonzai"), had coming to them ("You had me and Robert Wayne Vickers, Bonzai. We earned everything we got there [at SMU II], man, that's how we got there").

---

[10]Comer was incarcerated in Folsom from 1979-1984 and in SMU I from 1988-1996. He has remained in SMU II from 1996 until the present.

[11][Comer]: "Yeah. I mean, [SMU II] is still not paradise, but god, you start comparing to Folsom — you compare it just to SMU I there's a big different [sic]. But SMU I was never anywhere close to being what Folsom was . . . . But we're talking what, 23 years ago was Folsom. We're talking SMU I was 15 years ago. And then we're talking SMU II, that's — I've been here at SMU II that's what, six or seven years. And hell, I could tell you differences just two years ago — how much conditions have changed in our prison for all of us over there. It's gotten better just from two years ago. Not a big major change, like a big major change between Folsom and today, but you can still see it."

**[7]** Thus, because Comer's waiver was "the product of a free and deliberate choice rather than coercion or improper inducement," *Doe*, 155 F.3d at 1074, the District Court did not err in determining that Comer voluntarily waived his habeas appeal right.

### B. The Waiver's Constitutionality

A capital defendant's waiver of appeal requires particularly careful scrutiny. Generally, "[w]e lack jurisdiction to entertain appeals where there was a valid and enforceable waiver of the right to appeal." *United States v. Jeronimo*, 398 F.3d 1149, 1152-53 (9th Cir. 2005). However, "because there is a qualitative difference between death and any other permissible form of punishment, 'there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.' " *Zant v. Stephens*, 462 U.S. 862, 884-85 (1983) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)). "By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." *Roper v. Simmons*, 543 U.S. 551, 560 (2005).

**[8]** The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor *cruel and unusual punishments inflicted*." U.S. Const. amend. VIII (emphasis added). Its protections apply to the states through the Fourteenth Amendment. *Furman v. Georgia*, 408 U.S. 238, 239-40 (1972). "[T]he death penalty has been treated differently from all other punishments" insofar as it cannot be "imposed without the serious and calm reflection that ought to proceed any decision of such gravity and finality." *Thompson v. Oklahoma*, 487 U.S. 815, 856 (1988) (O'Connor, J., concurring). For a death sentence to be constitutional, the Eighth Amendment requires that the sentence be imposed in a non-arbitrary fashion. *See Gregg v. Georgia*, 428 U.S. 153, 188, 189 (1976).

**[9]** Permitting a state to execute a capital defendant without a full adjudication of his previously filed federal habeas appeal amounts to an Eighth Amendment violation. The "[Supreme] Court has repeatedly emphasized that meaningful appellate review of death sentences promotes reliability and consistency." *Clemons v. Mississippi*, 494 U.S. 738, 749 (1990). Meaningful appellate review clearly includes review on direct appeal. *See Barefoot v. Estelle*, 463 U.S. 880, 887 (1983) ("[D]irect appeal is the primary avenue for review of a conviction or sentence, and death penalty cases are no exception."). But "significant evidence . . . demonstrates that the meaningful appellate review necessary in a capital case extends beyond the direct appellate process." *Murray v. Giarratano*, 492 U.S. 1, 24 (1989) (Stevens, J., dissenting).

**[10]** Especially vital is meaningful appellate review of a capital defendant's habeas petition. "The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action." *Harris v. Nelson*, 394 U.S. 286, 290-91 (1969). The writ demonstrates "Congress' expressed interest in providing a federal forum for the vindication of the constitutional rights of state prisoners." *Reed v. Ross*, 468 U.S. 1, 10 (1984). Habeas corpus is "not a 'static, narrow, formalistic remedy,' but one which must retain the 'ability to cut through barriers of form and procedural mazes.' " *Murray v. Carrier*, 477 U.S. 478, 501 (1986) (Stevens, J., concurring) (citation omitted). Its "central concern" is "fundamental fairness." *Strickland v. Washington*, 466 U.S. 668, 697 (1984). Indeed, of the 599 federal habeas petitions submitted from 1973 to 1995 challenging the constitutionality of death sentences, 237 of them were granted, or nearly 40%. James Liebman, A BROKEN SYSTEM: ERROR RATES IN CAPITAL CASES, 1973-1995, E-5 (1995). Between 1976 and 1983, approximately 70% of capital defendants who had been denied federal habeas relief in district court prevailed in federal courts of appeal. *Whitmore*, 495 U.S. at 170-71 (Marshall, J., dissenting). Habeas review, therefore, significantly increases the reliability of a death sentence.

**[11]** In contrast, allowing a defendant to arbitrarily waive such review, once it has been properly initiated by the defendant and the reviewing court has been presented with briefs that demonstrate the defendant's conviction or sentence may indeed be unconstitutional, violates the Eighth Amendment. The defendant is not taking his own life, he is coopting the power of the state's capital punishment system to kill — a power that must only be wielded in accordance with the Constitution's fundamental protections. The people's interest in justice, which forms the basis of the state's power to execute, should not be so easily commandeered. The right to die is not synonymous with the right to kill.

Comer once felt strongly about his federal habeas claims. His own attorneys — then habeas counsel — filed briefs that alerted this panel to potentially serious constitutional violations that occurred during Comer's trial and sentencing proceedings. To pretend these claims have gone away is to permit the state to execute a man who has been sentenced wrongfully.[12] The state should not be able to execute an illegally convicted or sentenced person. As the Pennsylvania Supreme Court so eloquently counseled:

> [W]hile a defendant may normally make an informed and voluntary waiver of rights personal to himself, his freedom to do so must give way where a substantial public policy is involved; in such a case an appeals court may feel fully warranted in seeking to reach an issue. . . . Because imposition of the death penalty is irrevocable in its finality, it is imperative that the standards by which that sentence is fixed be constitutionally beyond reproach. . . . [T]he waiver concept was never intended as a means of allowing a criminal defendant to choose his own sentence.

---

[12]*See* Section II.C., *infra*, "Comer's Habeas Claims."

*Commonwealth v. McKenna*, 383 A.2d 174, 181 (Pa. 1978) (internal citations omitted).[13]

[12] To allow a defendant to choose his own sentence introduces unconscionable arbitrariness into the capital punishment system. *See Massie v. Sumner*, 624 F.2d 72, 74 (9th Cir. 1980). Permitting such waiver allows the defendant, not the justice system with its attendant procedural safeguards, to determine whom the state will execute. Comer seeks death, yet the errors in his sentencing hearing prevent us from knowing if he is a member of that narrow class of individuals that the state is permitted to execute. *See Gregg*, 428 U.S. at 189. Indeed, "the waiver rule cannot be exalted to a position so lofty as to require this Court to blind itself to the real issue— the propriety of allowing the state to conduct an illegal execution of a citizen." *McKenna*, 383 A.2d at 181. We cannot abdicate our judicial and societal duty to preserve the sanctity of the Eighth Amendment from such violation. Federal appellate review of a capital defendant's federal habeas petition is a vital protection against such arbitrary and inconsistent infliction of the death penalty.

[13] We note that limiting a defendant's ability to unilaterally waive constitutional safeguards is not without precedent. For example, the Supreme Court upheld a rule that does not allow a defendant to waive his right to a jury trial without the consent of the court and of the prosecution. *See Singer v. United States*, 380 U.S. 24, 34-35 (1965) ("The ability to

---

[13]Because of similar concerns, the state of New Jersey has made mandatory not only direct appellate review, but also at least one round of post-conviction review. *State v. Martini*, 677 A.2d 1106 (N.J. 1996). The New Jersey Supreme Court explained its decision thus: "For those who wish to understand, we explain that under our form of government it is not the inmate on death row or the accused who determines when and whether the State shall execute a prisoner; rather, the law itself makes that determination. The public has an interest in the reliability and integrity of a death sentencing decision that transcends the preferences of individual defendants." *Id*. at 1107.

waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right."). Nor may an accused assert a right to plead guilty to any criminal charge, and thereby waive his right to a jury trial, absent a determination of a factual basis for the plea. *See* FED. R. CRIM. P. 11(b)(3); *McCarthy v. United States*, 394 U.S. 459, 466-67 (1969). The *McCarthy* Court recognized that a defendant should not be allowed to determine whether he is convicted of a crime, by pleading guilty, if "his conduct does not actually fall within the charge." *Id.* at 467. Similarly, Comer should not be allowed to sentence himself to death if the state has not properly fulfilled its obligation to determine who falls within the narrow class of individuals who deserve capital punishment.

This Circuit has already implicitly recognized the correctness of our position. In *Landrigan v. Schriro*, we ignored the defendant's attempt to waive his pending habeas appeal. 441 F.3d 638, 653 n.2 (9th Cir. 2006) (en banc) (Bea, J., dissenting). Instead, in an en banc proceeding, we held that Landrigan may have received ineffective assistance of counsel during his sentencing hearing and remanded for an evidentiary hearing to develop the facts of the claim. *Id.* at 650.

**[14]** Thus, in spite of Comer's valid waiver, we must review the merits of his habeas claims on appeal. To do otherwise, and allow Comer to be executed despite the infirmities in his sentence, would be to deny him the dignity of being treated fairly and justly by a state that claims the power of life and death over his person.

The dissent contends that review of the Eighth Amendment claim before us is foreclosed by *Gilmore v. Utah*, 429 U.S. 1012 (1976). However, the *Gilmore* Court never addressed the constitutional claim presented by the petitioner, namely whether a state must provide mandatory appellate review of a capital defendant's conviction and sentence despite the defendant's desire to waive such review. *See Gilmore*, 429

U.S. at 1017 ("The question . . . [of whether] Gilmore is 'unable' as a matter of law to waive the right to [meaningful] state appellate review . . . simply is not before us.").

In *Gilmore*, the Court's holding turned on the petitioner's lack of standing. *Id.* at 1014, 1016-17. In that case, convicted defendant Gary Mark Gilmore directed his attorneys not to appeal his conviction or sentence and to withdraw an appeal that had previously been filed without his consent, by appointed trial counsel. *Id.* at 1015, n.4. However, four days before Gilmore's scheduled execution, his mother, Bessie Gilmore, filed an application for a stay of execution, claiming to be acting as her's son's "next friend." *Id.* at 1013. Mr. Gilmore, by and through his attorneys, then filed a response, challenging his mother's standing.

A next friend is one who appears on behalf of a party "unable, usually because of mental incompetence or inaccessibility, to seek relief [himself.]" *Whitmore*, 495 U.S. at 162 (citations omitted). A "necessary condition for 'next friend' standing in federal court is a showing by the proposed 'next friend' that the real party in interest is unable to litigate his own cause due to mental incapacity, lack of access to court, or other similar disability." *Id.* at 165. The majority in *Gilmore* held that Mr. Gilmore had "made a knowing and intelligent waiver of any and all federal rights he might have asserted," and therefore did not consider the substance of the claims his mother had raised as his next friend. *Id.*, at 1013.

*Whitmore*, 495 U.S. 149, is another case, similar to *Gilmore*, that may at first appear relevant but is actually inapposite. In *Whitmore,* Jonas Whitmore sought to challenge the validity of the sentence imposed on fellow death row inmate Ronald Simmons, who had knowingly, intelligently, and voluntarily chosen to appeal neither his conviction nor his sentence. *Id.* at 151. The Supreme Court ruled that Whitmore lacked standing, and dismissed the petition for lack of jurisdiction. *Id.* at 165-66.

Notably, neither *Gilmore* nor *Whitmore* was decided without significant dissenting opinions:

> When a capital defendant seeks to circumvent procedures necessary to ensure the propriety of his conviction and sentence, he does not ask the State to permit him to take his own life. Rather, he invites the State to violate two of the most basic norms of a civilized society—that the State's penal authority be invoked only where necessary to serve the ends of justice, not the ends of a particular individual, and that punishment be imposed only where the State has adequate assurance that the punishment is justified. The Constitution forbids the State to accept that invitation.

*Whitmore* 495 U.S. at 173 (Marshall, J., dissenting, joined by Brennan, J.); *See Gilmore*, 429 U.S. at 1018 (White, J., dissenting, joined by Marshall and Brennan, J.) ("[T]he consent of a convicted defendant . . . does not privilege a State to impose a punishment otherwise forbidden by the Eighth Amendment.").

But the remaining Justices in both cases expressly stated that they were not reaching the issues addressed in the dissents. In *Gilmore*, 429 U.S. at 1017 (J. Stevens, concurring, joined by J. Rehnquist), Justice Stevens's concurrence described Bessie Gilmore's petition as one of a "third party [who] has no standing to litigate an Eighth Amendment claim or indeed any other claim on [the defendant's] behalf." Justice Berger stated that the question raised in Justice White's dissent was not before the Court. *Id.* at 1017 (J. Burger, concurring, joined by J. Powell).

Similarly, in *Whitmore*, 495 U.S. at 151, 155 (internal quotations and punctuation omitted), Justice Rehnquist explained:

> This case presents the question whether a third party has standing to challenge the validity of a death sen-

tence imposed on a capital defendant who has elected to forgo his right of appeal to the State Supreme Court. . . . Our threshold inquiry into standing "in no way depends on the merits of the petitioner's contention that particular conduct is illegal," . . . and we thus put aside for now Whitmore's Eighth Amendment challenge[.]

Comer's case is different. Comer himself initiated his current appeal and properly stands before this court in his own right. Comer began the present federal habeas proceedings by filing with the District Court a preliminary petition for writ of habeas corpus, an application for appointment of counsel, and a request for a stay of execution. As a majority of this panel previously pointed out in its published opinion:

[Comer] signed the pleading himself, in which he described the procedural history of his case and alleged that, "I am being held in violation of my federal constitutional rights." [He] specifically requested that the district court appoint Peter J. Eckerstom, his current counsel, and John R. Hannah, Jr., of the Law Offices of the Federal Public Defender in Arizona, to represent him. He also asked the court to both provide his attorneys with sufficient time to file an amended petition and to grant a stay of execution. In support of his request for the appointment of counsel, he signed an affidavit attesting to his indigence.

When Mr. Comer returned to state court with his federal constitutional claims, he personally verified the petition and repeated that he had given his consent to his counsel to proceed. He stated on that form that the petition contained every ground of which he was aware for granting a writ of habeas corpus. Further, he wrote that "Peter J. Eckerstrom is authorized

to represent me in this matter. The pleadings he has
already filed are authorized by me."

*Comer*, 215 F.3d at 912.

Comer himself filed opening and reply briefs in this Court
"rais[ing] serious questions about the constitutionality of his
conviction and sentence." *Comer*, 215 F.3d at 912. In con-
trast, Gilmore never chose to appeal. *Gilmore*, 429 U.S. at
1015, n.4. We exercised 28 U.S.C. § 2253 jurisdiction over
Comer's habeas petition in 2000, and oral argument pertain-
ing to the merits of his claims had been scheduled prior to the
filing of any motion to dismiss the appeal. The State's and
Habeas Counsel's briefs concerning the merits of Comer's
habeas petition are today pending before this Court.

We now decide a question left unanswered by the Supreme
Court: whether the Constitution permits a state to execute a
capital defendant who wants to die but whose properly filed
federal habeas appeal has not yet been substantively
reviewed. We answer this question in the negative.

### C.   Comer's Habeas Claims

#### 1.   Standard of Review

**[15]** Because Comer filed his federal habeas petition in
1994, the Anti-Terrorism and Effective Death Penalty Act of
1996 ("AEDPA") does not apply to his petition. *See Lindh v.
Murphy*, 521 U.S. 320, 327 (1997). We therefore apply pre-
AEDPA standards of review. *Woodford v. Garceau*, 538 U.S.
202, 205 (2003). Under these standards "state court judgments
of conviction and sentence carry a presumption of finality and
legality and may be set aside only when a state prisoner car-
ries his burden of proving that [his] detention violates the fun-
damental liberties of the person, safeguarded against state
action by the Federal Constitution." *Hayes v. Brown*, 399 F.3d
972, 978 (9th Cir. 2005) (en banc).

We review de novo the District Court's denial of habeas relief. *See Alcala v. Woodford*, 334 F.3d 862, 868 (9th Cir. 2003).

### 2. *Exhaustion*

#### a. Federal Standard

**[16]** Consistent with our pre-AEDPA standard, habeas relief shall not be granted unless it appears that a petitioner has exhausted state remedies "or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner." 28 U.S.C. § 2254(b) (1994). For us to pass on the merits of a constitutional claim, that claim must first have been "fairly presented to the state courts." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation marks and citation omitted); *Casey v. Moore*, 386 F.3d 896, 911 (9th Cir. 2004).

**[17]** Even if a petitioner fails to raise a constitutional claim in state court, the exhaustion requirement may be satisfied, allowing us to address the claim on its merits, where the state court itself exhausts the claim. In particular, where a state court is required to review the record for federal constitutional error, the state court's determination that there was no error constitutes sufficient state consideration of a constitutional claim, which impliedly exhausts that claim in a way that is not independent of federal law. *See Ake v. Oklahoma*, 470 U.S. 68, 74-75 (1985); *Beam v. Paskett*, 3 F.3d 1301, 1306-07 (9th Cir. 1993), *overruled on other grounds by Lambright v. Stewart,* 191 F.3d 1181, 1185 (9th Cir. 1999). A state court's automatic review process does not necessarily exhaust all federal constitutional claims. *See Poland v. Stewart*, 117 F.3d 1094, 1105-06 (9th Cir. 1997) (distinguishing Arizona's fundamental error review provision as not providing implied exhaustion of otherwise precluded constitutional claims). Rather, only

those claims that the state court is specifically required to review are exhausted on the merits by that review. *Id.* at 1106.

In *Beam*, we construed the Idaho Supreme Court's automatic review of death sentences as impliedly exhausting constitutional claims not raised by the capital defendant on direct appeal in state court. 3 F.3d at 1306-07.[14] Because the Idaho Supreme Court "ha[d] an affirmative duty to review the entire record in a capital case to determine . . . whether 'the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor[,]' [t]he state court must [have] consider[ed] possible errors in sentencing that [were] not raised by the defendant." *Id.* (internal citation omitted). The Idaho Supreme Court's decision to affirm Beam's death sentence necessarily included an "antecedent determination of federal law." *Id.* at 1307. Thus, Beam's challenge to the constitutionality of the use of an aggravating factor during sentencing was not procedurally defaulted. *Id.*

> b.   Arizona Supreme Court's Independent Review of Capital Cases

[18] As in *Beam*, we look both to Arizona's statutes and its case law to determine the parameters of Arizona's independent review of capital cases. "In capital cases, [the Arizona Supreme Court] independently examine[s] the record to determine the existence of aggravating and mitigating circumstances *and* the propriety of imposing the death penalty." *Comer*, 799 P.2d at 348 (Ariz. 1990) (emphasis added). This independent review specifically encompasses review of the sentencing hearing and record as well as aggravating and mitigating circumstances to ensure, among other things, that

---

[14]The State contends that the Court's decision in *Teague v. Lane*, 489 U.S. 288 (1989), bars retroactive application of *Beam* to Comer's case. We have held, however, that *Teague* does not apply to matters of federal habeas jurisdiction, including our exhaustion analysis. *Coe v. Thurman*, 922 F.2d 528, 533-34 (9th Cir. 1991).

"proper procedures were followed." *State v. Hill*, 848 P.2d 1375, 1388 (Ariz. 1993) (citation omitted) (reviewing whether the sentencing judge had an impermissible conflict that required his recusal, as well as aggravating and mitigating circumstances); *accord State v. Stuard,* 863 P.2d 881, 896-97 (Ariz. 1993) (undertaking a "painstaking" examination of the record to determine if the death penalty was erroneously imposed); *State v. Bible*, 858 P.2d 1152, 1206 (Ariz. 1993); *see also State v. Watson*, 628 P.2d 943, 946 (Ariz. 1981) (noting that the Arizona Supreme Court painstakingly reviews death sentences to ensure the punishment is not inflicted in an arbitrary and capricious manner). The Arizona Supreme Court also ensures that the death penalty was not "imposed under the influence of passion, prejudice, or any other arbitrary factors." *State v. Richmond*, 560 P.2d 41, 51 (Ariz. 1977), *overruled on other grounds by State v. Salazar*, 844 P.2d 566 (Ariz. 1992); *accord State v. Woratzeck*, 657 P.2d 865, 871 (Ariz. 1982). This independent review process includes scrutiny of federal constitutional claims. *State v. Brewer*, 826 P.2d 783, 790-91 (1992) (undertaking independent review because, among other matters, the Arizona Supreme Court must determine that under the Eighth and Fourteenth Amendments the death penalty is not being inflicted in an arbitrary and capricious fashion). As the Arizona Supreme Court noted in explaining its review, "[i]f the record reveals that the trial court, *for whatever reason*, improperly sentenced a defendant to death, we must overturn that sentence." *Id*. at 791 (emphasis added).[15]

---

[15]We have recognized the thoroughness of the Arizona Supreme Court's independent review process in another context. *See Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997) (finding that Arizona's independent review as to the "propriety and legality of the death penalty" justifies counsel's tactical decision to rely on that review instead of independently raising claims related to defendant's sentencing).

### c. Comer's Impliedly Exhausted Habeas Claims

The District Court found seven of Comer's present habeas claims to be procedurally defaulted because Comer failed to raise them in state court.[16] As explained below, however, under the Arizona Supreme Court's independent review process, four of these seven claims were impliedly exhausted; therefore, we may address the merits of those claims.

The preceding discussion makes clear that during its independent review, the Arizona Supreme Court examines the entire record, particularly the sentencing hearing, to determine if any procedural errors occurred or other arbitrary factors influenced the sentencing court's decision to impose the death sentence. The Arizona Supreme Court is clearly conscious of its duty to respect the dictates of the Eighth and Fourteenth Amendments and to ensure that the death penalty is not imposed in an arbitrary and capricious fashion.

Four of the claims Comer initially presented to the District Court (Claims VIII, IX, X, and XI) relate to the procedural conduct of his sentencing hearing, and directly implicate Eighth and Fourteenth Amendment protections against the arbitrary imposition of the death penalty. These claims were also readily apparent from the record that the Arizona Supreme Court painstakingly reviewed. *Cf. Falcone v. Stewart*, 120 F.3d 1082, 1084 n.2 (9th Cir. 1997) (constitutional

---

[16]Specifically, those claims include: (1) the unconstitutionality of the trial court's failure to follow a statutorily required procedure at a post-competency hearing (Claim VIII), (2) the unconstitutionality of the trial court's conducting a post-competency hearing in Comer's absence (Claim IX), (3) the unconstitutionality of the trial court's sentencing Comer while unclothed and semi-conscious (Claims X and XI), (4) the insufficiency of evidence to support the court's finding that Comer committed the homicide for pecuniary gain (Claim XII), (5) the Arizona Supreme Court's failure to consider the cumulative weight of Comer's mitigation evidence (Claim XIV), and (6) the Arizona death penalty statute's failure to narrow the class of defendants subject to the death penalty (Claim XVI).

claims that are "readily apparent from the record" fall under the penumbra of the automatic review process), *vacated on other grounds*, 524 U.S. 947 (1998). Therefore, we hold that they were impliedly exhausted, on their merits, by Arizona's independent review of Comer's capital case. We examine the implied exhaustion of each of these penalty-phase claims in turn.

First, Comer claims that the trial court violated his Fifth, Sixth, and Fourteenth Amendment rights by not determining his competency during the sentencing hearing, and not following a statutorily required procedure at a post-sentence competency hearing (Claim VIII). Comer's compromised physical and mental condition during sentencing is readily apparent from the record that was presented to the Arizona Supreme Court. That record included a transcript of the sentencing hearing, which begins with the very question of whether Comer is even conscious. This question arose because Comer was presented to the court nearly naked, shackled to a wheelchair, with his head slumped to the side, and bleeding from a head wound. A videotape of the sentencing, demonstrating Comer's condition, was also before the Arizona Supreme Court. Furthermore, the record included a transcript of the post-sentencing competency hearing, held the next day, in which Comer's competency during sentencing was explicitly discussed. These transcripts and videotape gave ample notice to the Arizona Supreme Court that Comer's competency was of concern during the sentencing hearing. Additionally, to sentence a defendant while he is incompetent is a federal due process violation. *See Sailer v. Gunn*, 548 F.2d 271, 273-74 (9th Cir. 1977); *see also Pate v. Robinson*, 383 U.S. 375, 378 (1966); *Drope v. Missouri*, 420 U.S. 162, 172 (1975). The Arizona Supreme Court's decision not to address this constitutional issue during its independent review was an implicit rejection of any error.

Second, Comer claims that the conduct of the post-sentence competency hearing in his absence violated his Sixth, Eighth,

and Fourteenth Amendment rights (Claim IX). Again, Comer's absence from the post-sentence hearing is readily apparent from the transcripts. A defendant has a constitutional right to be present at any critical stage of his prosecution, including at capital sentencing hearings, *see Gardner v. Florida*, 430 U.S. 349 (1977), and hearings to determine the defendant's competency, *see Sturgis v. Goldsmith*, 796 F.2d 1103, 1108 (9th Cir. 1986). Thus, by failing to address this issue, the Arizona Court again impliedly rejected any error.

Third, Comer claims his sentencing while unclothed and semi-conscious violated the due process clause of the Fourteenth Amendment (Claims X and XI). The egregious circumstances of Comer's condition during sentencing are readily apparent from both the trial transcript and the videotape presented to the Arizona Supreme Court. By not commenting on this issue, the Arizona Court implicitly signaled its rejection of any error.

**[19]** We hold, therefore, that these four claims were exhausted on their merits by the Arizona Supreme Court's independent review of Comer's capital case. Comer's three other claims (Claims XII, XIV, and XVI) are neither as readily apparent from the record nor as clearly encompassed within Arizona's independent review. Thus, we do not find them to be impliedly exhausted. We may proceed to decide the merits of Comer's impliedly exhausted claims without remand to the District Court. *See Beam*, 966 F.2d at 1570-75; *Granberry v. Greer*, 481 U.S. 129, 131 (1987) (noting that a federal appellate court may appropriately decide the merits of a habeas petition).

Additionally, Comer argues that Arizona's fundamental error review exhausted most of the other claims he presented to the District Court. We have held, however, that we will only consider a claim to be exhausted by Arizona's fundamental error review if it was explicitly noted in the briefs presented to the state appellate court, or the state court men-

tions it is considering the claim *sua sponte*. *See Moormann v. Schriro*, 426 F.3d 1044, 1057 (9th Cir. 2005). Because neither occurred in this case, we affirm the District Court's finding that most of Comer's other habeas claims were procedurally defaulted.

We now proceed to address on the merits Comer's impliedly exhausted and actually exhausted claims. First, we will consider the four guilt-phase claims that Comer raises in his appeal brief and that the District Court found were actually exhausted and thus not procedurally defaulted. Second, we will address Comer's penalty phase claims, which include an actually exhausted claim of ineffective assistance of counsel and the four impliedly exhausted claims we have discussed in this section.

**Volume 2 of 2**

### 3.   *Guilt-Phase Claims*

Comer contends that his conviction should be set aside because of several constitutional errors that occurred during the guilt phase of his trial. Specifically, Comer claims that: (1) the trial court's failure to sever the Pritchard homicide count from the Andrews and Brough kidnapping/robbery/sexual assault counts violated his due process right to a fair trial; (2) the trial court's failure to sever the counts also violated his constitutional right to testify; (3) the prosecutor's misconduct during closing argument deprived Comer of a fundamentally fair trial; and (4) the trial court's failure to strike two venirepersons for cause denied Comer his Sixth Amendment right to a fair and impartial jury.

The District Court considered the merits of all four of these claims and denied Comer's habeas petition. We agree with the District Court that Comer is not entitled to relief based upon any of these claims; therefore, his conviction should stand and we deny his habeas petition as to these guilt-phase claims.

### a.   *Severance*

#### i.   Due Process

Comer's first claim is that the trial court improperly joined the Pritchard homicide count to the Andrews and Brough kidnapping/robbery/sexual assault counts. Comer contends that, because the evidence with regard to the Andrews and Brough counts was stronger and more inflammatory than the evidence relating to the first-degree murder count, he was prejudiced by the joinder of the offenses since the inflammatory evidence had a substantial and injurious impact on the jury's determination regarding the first-degree murder count.

[20] "[T]he propriety of consolidation rests within the sound discretion of the state trial judge." *Fields v. Woodford*, 309 F.3d 1095, 1110 (9th Cir. 2002). Thus, we will not grant

habeas relief unless the joinder "actually render[ed] petitioner's state trial fundamentally unfair and hence, violative of due process." *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004) (citation omitted); *Bean v. Calderon*, 163 F.3d 1073, 1084 (9th Cir. 1998). "The requisite level of prejudice is reached only if the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict." *Davis*, 384 F.3d at 638 (internal quotation marks and citation omitted). We conclude that the joinder of the homicide and kidnapping/robbery/sexual assault counts did not render Comer's trial fundamentally unfair.

Comer contends that the circumstances of his trial are analogous to those found in *Bean v. Calderon*, a case in which we held that the joinder of two murder counts prejudiced the defendant as to one of the counts. 163 F.3d at 1083-86. The likelihood of prejudice in *Bean*, however, was much greater than the likelihood that Comer was prejudiced by the joinder of the homicide and kidnapping/robbery/sexual assault counts.

First, in *Bean*, we found that the evidence regarding the separate murder counts at issue would not have been cross-admissible had the counts been tried separately. 163 F.3d at 1084. In contrast, the Arizona Supreme Court held that the homicide and kidnapping/robbery/sexual assault counts were properly joined because evidence pertaining to both sets of offenses demonstrated that Comer was engaged in a common scheme or plan to obtain money and supplies. *Comer*, 799 P.2d at 338-39 (Ariz. 1990). Thus, as Comer acknowledges, at least some of the evidence presented at his trial was admissible as to all of the counts. This cross-admissibility of evidence significantly reduces the potential prejudice to Comer. *See, e.g.*, *Davis*, 384 F.3d at 638-39 (finding no prejudice to the defendant when evidence was cross-admissible, the weight of evidence for each count was roughly equivalent, and the court gave a limiting instruction); *cf. Leach v. Kolb*, 911 F.2d 1249, 1258-60 (7th Cir. 1990) (holding that, even

when counts were not properly joined under state law, the misjoinder was not prejudicial due to a limiting instruction and strong evidence of guilt as to each charge).

Second, the improperly joined counts in *Bean* consisted of two murders. 163 F.3d at 1083. However, when the joined offenses are different in nature, such as murder and kidnapping/sexual assault, and specific evidence is presented as to each crime, the risk of confusing or misleading the jury is reduced. *See United States v. Irvine*, 756 F.2d 708, 712-13 (9th Cir. 1985).

Third, the jury in *Bean* received only a very general instruction that each count must be decided separately. 163 F.3d at 1083. In contrast, Comer's jury was explicitly instructed "to give separate consideration to each individual count" and to "analyze what the evidence in each count shows with respect to that individual count." While this instruction may not have been ideal, since the court subsequently instructed that jury that some evidence might overlap between the counts, it still acted to limit any prejudice. *See Davis*, 384 F.3d at 639 ("[A]ny prejudice was further limited through an instruction directing the jury to consider each count separately.").

Finally, the evidence relating to Comer's guilt of the Pritchard homicide count was strong, as was the evidence of the kidnapping/robbery/sexual assault counts. In *Bean*, the prosecution was able to muster only scant evidence to convict Bean of the second murder count, including a disputed fingerprint, a matching hair, and testimony of a neighbor who saw Bean hiding in some bushes across from the victim's house several weeks before the crime took place. 163 F.3d at 1085. Here, in contrast, during closing argument Comer's counsel admitted that Comer shot Pritchard. Comer's defense was that the shooting was an accident precipitated by Comer's intoxication at the time, and thus did not involve the premeditation necessary for a finding of first degree murder. The prosecution

presented substantial evidence to rebut this theory, including: (1) the location of the wound, behind the ear, which suggested a deliberate shooting; (2) testimony of Willis that, moments before the shooting, Comer told her, "I'm going to blow him away," and that after the shooting Comer said "[s]ee what I've done, I'm a cold and callous killer"; and (3) evidence that Comer stabbed Pritchard in the throat after the shooting. Comer counters that Willis's testimony cannot be believed. When faced with this argument in *Sandoval v. Calderon*, however, we held that the issue of a witness's credibility is for the jury to decide. 241 F.3d 765, 772-73 (9th Cir. 2000). The jury's conviction of Comer on the first degree murder count suggests it credited Willis's testimony. Additionally, all parties agree that the evidence as to Comer's guilt with regard to the kidnapping/robbery/sexual assault counts was overwhelming.

**[21]** Given the strength of the evidence against Comer on all counts, the cross-admissibility of that evidence, and the trial court's limiting instruction, we hold that Comer's trial was not rendered fundamentally unfair by joinder of the counts. *See, e.g.*, *Davis*, 384 F.3d at 638-39 (holding no prejudice to defendant when evidence was cross-admissible, weight of evidence for each count was roughly equivalent, and court gave a limiting instruction); *Fields*, 309 F.3d at 1109-1110 (holding no prejudice to defendant when evidence was cross-admissible and evidence of guilt as to all counts was strong); *Sandoval*, 241 F.3d at 771-73 (same).

### ii.   Right to Testify

In a related claim, Comer contends that his right to testify under the Fifth, Sixth, and Fourteenth Amendments was violated when the trial court refused to sever the Pritchard homicide count from the Andrews and Brough counts.

Comer is correct in asserting that he has a due process right to testify in his own defense. *See Rock v. Arkansas*, 483 U.S.

44 (1987). The right to testify, however, does not guarantee a defendant's ability to testify only to information favorable to his defense. *Rock*, 483 U.S. at 52 (a defendant who chooses to testify is subject to cross-examination); *United States v. Alosa*, 14 F.3d 693, 696 (1st Cir. 1994) (noting that the Fifth Amendment protects a defendant's right to choose whether to testify, but "does not assure that the testimony will only benefit the defendant"). A defendant, therefore, retains the ability to decide strategically whether to testify and thus revealing damaging information. *See Rock*, 483 U.S. at 53.

**[22]** However, joinder of counts may unduly affect a defendant's choice whether to testify. *See, e.g.*, *United States v. Balzano*, 916 F.2d 1273, 1283 (7th Cir. 1990). To obtain severance because of this prejudicial effect, a defendant "must show that he has important testimony to give on some counts and a strong need to refrain from testifying on those he wants severed." *See United States v. Nolan*, 700 F.2d 479, 483 (9th Cir. 1983). Applying *Nolan* to this case, we hold that Comer was not entitled to severance based on his Fifth, Sixth, and Fourteenth Amendment right to testify.

**[23]** Comer claims that, had the counts not been joined, he would have testified to the circumstances surrounding his shooting of Pritchard. Because he did not wish to testify regarding the Andrews and Brough counts, however, he refrained from taking the stand, or even attending the trial, because his motion for severance was not granted. In support of his motion for severance, a defendant must specifically identify the testimony he would offer in his defense so that the trial court can determine if that testimony is important enough to justify severance. *See United States v. Fenton*, 367 F.3d 14, 22 (1st Cir. 2004) (holding that a bald assertion of innocence and unparticularized claim as to witness credibility was not specific enough to mandate severance); *United States v. Alexander*, 135 F.3d 470, 477 (7th Cir. 1998) (requiring specific examples of the exculpatory testimony the defendant would give). Before the trial court, Comer's counsel asserted

that Comer would testify that the shooting was unintentional and give details of the surrounding circumstances. Comer would also have refuted Willis's testimony by denying that he ever made the statements "I'm going to blow him away" and "I'm a cold, callous killer." Without additional details regarding the circumstances Comer would have testified to, we find this proffered testimony is not specific enough to mandate severance.

Additionally, Comer did not have a strong need to refrain from testifying as to the Jones and Smith counts. "[A] defendant fails to make a convincing demonstration of a strong need to refrain from testifying on particular counts when[,] [w]ithout [the defendant's] testimony, the government offered sufficient evidence to support the jury's verdict on these counts." *Balzano*, 916 F.2d at 1283 (internal quotation marks omitted); *accord United States v. Freeland*, 141 F.3d 1223, 1227 (7th Cir. 1998). As discussed in the previous section, all parties agree that the evidence with regard to the Jones and Smith counts, which included the eyewitness testimony of Jones, Smith, Willis, and Willis's daughter, was overwhelming. Thus, Comer lacked a strong need to refrain from testifying to these counts.

**[24]** For these reasons, the trial court did not violate Comer's Fifth, Sixth, and Fourteenth Amendment rights by refusing to sever the Pritchard count from the Jones and Smith counts.

### b. *Prosecutorial Misconduct*

Comer's next claim is that the prosecutor engaged in misconduct that violated Comer's Fourteenth Amendment due process rights by rendering his trial fundamentally unfair. In particular, Comer takes issue with the prosecutor's use of dehumanizing epithets during closing argument. Comer claims the remarks were both improper and impermissibly appealed to the passion and prejudice of the jury.

**[25]** As all of the other courts before us have done, we condemn the prosecutor's remarks. At various times throughout closing argument, the prosecutor repeatedly referred to Comer as a "monster" and "filth," analogized his crimes to a horror movie, and once called Comer a "reincarnation of the devil." We also agree with the other courts, however, that the prosecutor's remarks did not render Comer's trial fundamentally unfair. "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). Rather, we must decide "whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation marks omitted). "[T]he appropriate standard of review for such a claim on writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power." *Id.* (internal quotation marks omitted); *accord Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir. 1995).

First, we address Comer's claim that the prosecutor's dehumanizing epithets rendered his trial fundamentally unfair. The prosecutor's remarks regarding Comer are similar to those uttered by the prosecutors in *Darden*. There, the prosecutors called the defendant an "animal" and asserted that he should be kept on a leash. 477 U.S. at 180 n.11 & n.12. The prosecutors also expressed their wish that Darden's face had been blown off during his crimes, and argued that Darden deserved the death penalty to prevent him from ever terrorizing the public again. *Id.* at 180 n.10 & n.12. Both Darden's prosecutors and Comer's prosecutor dehumanized their respective defendants with these remarks.

Nonetheless, in *Darden*, the Supreme Court held that the prosecutors' remarks did not deny the defendant a fundamentally fair trial for several reasons, including: the prosecutor did not manipulate or misstate any evidence; many of the remarks were responsive to comments made by the defense; the trial court instructed the jurors that their decision "was to

be made on the basis of the evidence alone" and "the arguments of counsel were not evidence"; strong evidence of the defendant's guilt had been presented during the trial; and defense counsel turned many of the prosecutors' remarks against them in defense counsel's rebuttal. *Id*. at 181-82.

Similarly, Comer's prosecutor did not misstate or manipulate any evidence in making his objectionable remarks. The trial court also instructed the jurors that their decision was to be based only on the evidence produced in court, with evidence defined as witness testimony and exhibits. The jurors were specifically admonished that the lawyers' statements during opening and closing argument were not evidence. Furthermore, they were instructed not to be "influenced by sympathy or prejudice." And during his closing statement, the prosecutor warned the jurors that his statements, and those of defense counsel, were not "proof." These admonishments and instructions significantly limited any prejudice caused by the prosecutor's remarks. *See, e.g.*, *Furman v. Wood*, 190 F.3d 1002, 1006 (9th Cir. 1999) (upholding the state court's ruling that the prosecutor's improper statements did not render trial fundamentally unfair because the prosecutor also told the jury that his arguments were not evidence, and because the government presented a strong case against the defendant); *Hall v. Whitley*, 935 F.2d 164, 165-66 (9th Cir. 1991) (holding that the prosecutor's improper comments were isolated moments in a three day trial, and their effect was mitigated by the judge's instructions that closing arguments were not evidence, and the strong proof of the defendant's guilt).

Additionally, as discussed earlier, there was strong evidence of Comer's guilt. Comer claims that the prosecutor's remarks were intended to induce the jury to find that he had premeditated an intent to shoot Pritchard. However, the prosecutor only once referred to Comer as a "monster" when discussing the murder count. All of the prosecutor's other objectionable remarks were made during his discussion of the Andrews and Brough counts, on which there was overwhelm-

ing evidence of Comer's guilt. There was also strong evidence, including eyewitness testimony, regarding Comer's premeditation. Finally, any emotional impact that the prosecutor's statements may have had on the jury likely only replicated the impact of earlier eyewitness testimony from the victims and Willis. *See Fields v. Woodford*, 309 F.3d at 1109 ("[G]iven the eyewitness testimony about what [the defendant] did to [the victim], there is no reasonable probability that the prosecutor's emotional appeal affected the verdict.").

**[26]** Accordingly, we hold that while the prosecutor's remarks were improper, they do not rise to the level of a due process violation. *See Hall*, 935 F.2d at 165-66; *Kellogg v. Skon*, 176 F.3d 447, 451-52 (8th Cir. 1999) (holding that the prosecutor's improper remarks, including calling the defendant a "monster," "sexual deviant," and "liar," did not rise to the level of a due process violation because of limiting jury instructions, no attempt on the part of the prosecutor to manipulate or misstate the evidence, and heavy evidence of guilt).

Additionally, we reject Comer's contention that these remarks were an impermissible appeal to the passion and prejudice of the jury. Comer cites *Northern Mariana Islands v. Mendiola* for the proposition that comments "designed to appeal to the passions, fears, and vulnerabilities of the jury" may constitute grounds for reversal. 976 F.2d 475, 486-487 (9th Cir. 1992), *overruled on other grounds by George v. Camacho*, 119 F.3d 1393 (9th Cir. 1997). In *Mendiola*, however, "we emphasized . . . that the comment was prejudicial only in view of the weakness of the prosecution's case, the prosecutor's disingenuity as to the whereabouts of the missing weapon, and the Government's resort to coercion to obtain evidence." *United States v. Hinton*, 31 F.3d 817, 825 (9th Cir. 1994) (explaining our holding in *Mendiola*). Because none of these factors are present here, we hold that the prosecutor's remarks did not render Comer's trial fundamentally unfair.

c. *Refusal to Strike Venirepersons*

**[27]** Comer's fourth guilt-phase claim is that the trial court's failure to strike for cause two venirepersons denied Comer his right to a fair and impartial jury as required by the Sixth and Fourteenth Amendments. Comer contends that two of the venirepersons questioned during jury selection, Thrailkill and Wilborn, were biased because of their previous knowledge of some of the facts of the case and, therefore, should have been dismissed for cause. When the trial court refused to strike the two potential jurors, Comer's counsel used two of his preemptory challenges to remove them from the jury. Even if the trial court erred in failing to strike the two venirepersons in question, such error does not constitute an unconstitutional denial of a fair and impartial jury unless the venirepersons sit on the jury. *United States v. Martinez-Salazar*, 528 U.S. 304 (2000). Because Thrailkill and Wilborn were not members of Comer's jury, he suffered no constitutional harm.

d. *Conclusion*

**[28]** For the foregoing reasons, we affirm the District Court's denial of Comer's habeas petition as to his guilt-phase claims.

4. *Penalty-Phase Claims*

Pursuant to our holding that several of Comer's penalty-phase claims were impliedly exhausted by Arizona's independent review of Comer's capital case, we have before us five claims of error from Comer's sentencing hearing. Comer contends that: (1) his sentencing counsel rendered ineffective assistance; (2) he was constitutionally entitled to a hearing to determine his competency at the time of sentencing; (3) the conduct of a post-sentence competency hearing in his absence violated his Sixth, Eighth, and Fourteenth Amendment rights; (4) sentencing him while unclothed and semi-conscious

impaired his right to allocution; and (5) sentencing him for a capital crime while unclothed violated the Fourteenth Amendment.

As to Comer's fifth claim, we hold that his Fourteenth Amendment due process rights were violated by the circumstances under which he was presented to the sentencing court. Because we grant his writ of habeas corpus on this basis, we do not address Comer's other sentencing-phase claims.

### a. *Comer's Treatment During Sentencing*

**[29]** Comer contends that his due process rights under the Fourteenth Amendment were violated when he was sentenced to death while nearly naked and barely conscious. While this is an issue of first impression for this Court, we agree with Comer that his treatment during sentencing "shocks the conscience" and warrants reversal of his sentence.

"Regard for the requirements of the Due Process Clause 'inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings (resulting in a conviction) in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses.' " *Rochin v. California*, 342 U.S. 165, 169 (1952) (citation omitted). Conduct of state officials that "shocks the conscience" will not be tolerated. *Id*. at 172.

Subsequent decisions have given content to this broad protection. In particular, numerous courts have found that the routine and unjustified shackling of a defendant, at any stage of trial proceedings, violates due process. *See Deck v. Missouri*, 544 U.S. 622 (2005) (holding that the visible shackling of a defendant before a jury during the guilt phase or penalty phase of a capital trial violates due process absent case-specific security justifications for the shackling); *United*

*States v. Howard*, 429 F.3d 843 (9th Cir. 2005) (holding that the shackling of pretrial detainees during their first appearance before a magistrate judge violates due process unless reasonably related to a legitimate goal); *Duckett,* 67 F.3d at 746-50 (holding that the shackling of a defendant during the penalty phase of a capital trial is inherently prejudicial and may only occur if compelling circumstances justify the need for shackling to maintain order in the courtroom).

Five basic considerations have led courts to conclude that unjustified shackling is a due process violation. First, shackling suggests to the trier of fact that the defendant is dangerous, which adversely and impermissibly affects perception of the defendant in a way that undermines the trier's "ability to weigh accurately all relevant considerations — considerations that are often unquantifiable and elusive — when it determines whether a defendant deserves death." *Deck*, 544 U.S. at 633; *see also Duckett*, 67 F.3d at 748. Thus, "shackles can be a thumb [on] death's side of the scale." *Deck*, 544 U.S. at 633 (internal quotations omitted).

Second, shackling is an affront to the very "dignity and decorum of judicial proceedings." *Id*. at 631-32; *Howard*, 429 F.3d at 851; *Duckett*, 67 F.3d at 747-48. As the Supreme Court explained, "[t]he courtroom's formal dignity, which includes the respectful treatment of defendants, reflects the importance of the matter at issue, . . . and the gravity with which Americans consider any deprivation of an individual's liberty through criminal punishment." *Deck*, 544 U.S. at 631. Depriving a courtroom of such dignity undermines public confidence in judicial proceedings. *Id*.

**[30]** Third, shackles greatly reduce a defendant's ability to communicate with counsel and participate in his own defense. *Id*. at 631; *see also Howard*, 429 F.3d at 851; *Duckett*, 67 F.3d at 747-48. Fourth, and related to the third concern, physical restraints may also confuse and embarrass the defendant, impairing his mental faculties. *Howard*, 429 F.3d at 851;

*Duckett*, 67 F.3d at 747-48. And fifth, shackles may cause the defendant physical and emotional pain. *Id*. For these reasons, we and the Supreme Court have concluded that unjustified shackling substantially interferes with a defendant's right to a fair and decent trial and sentencing proceeding.

[31] The foregoing reasons apply with even greater force to the circumstances of Comer's sentencing. Comer was presented to the sentencing court not only in shackles, but nearly naked, with only a blanket covering his genitals, and slumped to one side in a wheelchair with blood oozing from his head wounds. His lack of clothing revealed to the court and the public his numerous and graphic tattoos, which cover most of his body. And the responses he mustered to the court's questions were cursory at best.

[32] This presentation of Comer — shackled, beaten, and tattooed — certainly increased the perception of his dangerousness. If Comer had been sentenced before a jury, these circumstances would have given rise to insurmountable prejudice. *See Deck*, 544 U.S. at 633. Because Comer was sentenced by a judge, however, this Circuit has concluded that the risk of prejudice is lessened. *See Howard*, 429 F.3d at 850. Nonetheless, when a judge is asked to decide whether a defendant deserves to live or die, the judge, like any jury, must weigh those considerations that are "often unquantifiable and elusive." *Deck*, 544 U.S. at 633. It is hard to believe that any human being, no matter how well-trained to be impartial, would be entirely unaffected by the dehumanizing impact of Comer's appearance in the courtroom.

[33] This dehumanizing effect was compounded by the fact that the final sentencing hearing was one of the few times Comer had appeared before the judge. Comer did not attend the pre-sentencing hearing at which aggravating and mitigating evidence was presented. He only appeared briefly before the court at the beginning of the guilt phase of his trial, then waived his presence for the rest of the proceeding. Thus,

Comer's presence before the court during his final sentencing hearing was one of the few times the judge had to confront the individual over whom he held the power of life and death. Yet the circumstances of this meeting, far from humanizing Comer, deprived him of his dignity.

Furthermore, the appearance of this naked, bleeding, shackled man was a severe affront to the dignity and decorum of the judicial proceedings. We have never before read of a man being sentenced to death, or even presented to a court, under such circumstances. Even inmates in solitary confinement have a dignitary interest in being clothed. *See, e.g., Maxwell v. Mason*, 668 F.2d 361, 363, 365 (8th Cir. 1981). If the court's formal dignity is a reflection of the importance of the matter at issue, *Deck*, 544 U.S. at 631, then preservation of that dignity is most important when deciding whether a man lives or dies. The sentencing of Comer without such dignity or decorum is unacceptable.

**[34]** Comer's condition during sentencing also diminished his ability to communicate with his counsel. Not only were his hands bound, but as the jail psychiatrist later testified, Comer was exhausted, which had an unquantified effect on his mental processes. And just as shackles may confuse and embarrass a defendant, so too certainly does being wheeled into a courtroom while nearly naked and exhausted. Finally, with respect to the fifth consideration, Comer suffered physical pain from his visible lacerations.

**[35]** As the foregoing demonstrates, the due process considerations that militate against the routine use of shackles during the trial and sentencing of defendants apply with even greater force to the circumstances under which Comer was sentenced. If those circumstances had been different — if Comer had been handcuffed, yet fully clothed and physically inviolate, when he attended the sentencing — then we would need to inquire further into the reasons for Comer's condition because even shackling may be justified by special circum-

stances such as security concerns. *Deck*, 544 U.S. at 633; *Howard*, 429 F.3d at 851. We cannot conceive of any reasonable justification, however, for escorting a *naked and bleeding* defendant into a courtroom for a capital sentencing hearing. We hold that Comer's due process rights were violated when he was sentenced while shackled, nearly naked, bleeding, and exhausted.

**[36]** Additionally, the circumstances of Comer's sentencing were so inherently prejudicial and their impact so difficult to divine from the trial transcript, that, as in the shackling cases, Comer "need not demonstrate actual prejudice to make out a due process violation." *Deck*, 544 U.S. at 635. When life and death are at stake, subjective considerations such as the humanity and dignity of a defendant will always influence the sentencing decision, whether it is made by judge or jury. The effect of Comer's diminished ability to communicate with his counsel, and the mental impact of his nakedness, exhaustion, and shackling, are also difficult to measure. Thus, we cannot find beyond a reasonable doubt that the circumstances of Comer's sentencing did not contribute to the sentence he received. For these reasons, Comer is entitled to a new sentencing hearing.

## III. CONCLUSION

We affirm the District Court's denial of Comer's habeas corpus petition as to the guilt phase of his trial. We reverse the District Court's denial of his writ of habeas corpus as to the penalty phase and remand with instructions to grant the writ as to the sentence unless Arizona begins resentencing proceedings within a reasonable amount of time to be determined by the District Court.

**AFFIRMED in part; REVERSED in part and REMANDED.**

RYMER, Circuit Judge, concurring in part and dissenting in part:

We need to — and may only — decide one question: whether death row inmate Robert Comer is competent to withdraw his appeal from denial of his petition for writ of habeas corpus and has done so knowingly and voluntarily. All of us agree that the answer to that question is yes, based on what the district court found following a *Rees*[1] hearing that we ordered. This means that this case is over, because Comer's waiver of further review of his habeas claims leaves no live controversy remaining between Comer and the State of Arizona.

Nevertheless, the majority reverses *on the merits* and orders the writ to issue. In the doing, it thumbs this court's nose at the United States Supreme Court, which made clear in *Gilmore v. Utah*, 429 U.S. 1012 (1976), that courts lack jurisdiction to consider unresolved constitutional issues underlying a death sentence when the defendant competently and voluntarily waives his right to pursue an appeal; at the district court, which went all out to conduct a comprehensive evidentiary hearing and issued an extraordinarily detailed and comprehensive, 90-page opinion setting forth its findings and conclusions on the competence and voluntariness of Comer's decision; and at Comer himself, who has repeatedly, competently and intelligently tried for five years to choose what he wants to do.

I dissent from this raw imposition of judicial power.

I

Comer filed a petition for habeas relief and appointment of

---

[1] *Rees v. Peyton*, 384 U.S. 312 (1966) (per curiam) (remanding for the district court to determine mental competence of a death-row inmate who sought to withdraw petition for certiorari).

counsel on July 19, 1994. Counsel were appointed and eventually the district court determined that he was not entitled to relief but granted a certificate of probable cause on March 3, 1998. A notice of appeal was filed, but Comer then sent several letters to the Arizona Attorney General, the Arizona trial judge who had presided over his trial and sentenced him, and the Arizona Supreme Court indicating that he had not authorized his habeas counsel to file the appeal with this court and that he wished to terminate their representation. Acting on these communications, the Attorney General filed a motion to dismiss Comer's appeal. Comer also filed a pro se motion to withdraw his appeal and to terminate habeas counsel's representation. Rather than rule on these motions on the existing record, we remanded to the district court so that it could hold an evidentiary hearing to determine whether Comer was competent to terminate counsel and to forego further legal review, and to determine whether his decision was voluntary. *Comer v. Stewart*, 215 F.3d 910 (9th Cir. 2000) (*Comer I*).

The district court appointed special counsel for Comer; appointed an independent expert (Dr. Sally Johnson, Associate Warden Medical/Chief Psychiatrist of the Health Services Division of the Federal Correctional Complex in Butner, North Carolina), as well as an expert requested by habeas counsel (Dr. Terry Kupers, a psychiatrist in private practice) to evaluate the competence and voluntariness of Comer's decision; and toured the prison and inspected the cell where Comer is now housed in addition to considering the conditions of his confinement from day one. It held a three-day evidentiary hearing at which Comer, the experts, and two prison officials testified. The district court rendered its decision October 16, 2002, finding under Supreme Court and Ninth Circuit law, which it meticulously surveyed, that Comer was competent and that his decision to withdraw his appeal was voluntary.

The court found that Dr. Johnson's evaluation of Comer was better supported by the evidence in the record and more

in accord with accepted psychiatric methods than Dr. Kuper's. Based on Johnson's opinion, the district court found that Comer does not suffer from depression, post-traumatic stress disorder, or SHU Syndrome. The court concluded that Comer is cognizant of the merits of his appeal, of its prospects for success, and of his ability to change his mind about withdrawing the appeal at any time before this court rules. It found that Comer's decision to withdraw his appeal and submit to execution is rational and based principally on his feelings of remorse for his crimes and his belief that he deserves the punishment society has imposed upon him (despite his personal opposition to the death penalty). The district court found that Comer also places great weight on the ability to make this choice on his own because it is *his* choice. Finally, the court concluded that the conditions of Comer's confinement, while undeniably harsh, were not so harsh that he had been forced to abandon a natural desire to live.

Habeas counsel appealed this decision. *Sua sponte*, the majority stayed further action pending the outcome of en banc proceedings in *Summerlin v. Stewart*, 267 F.3d 926 (9th Cir. 2001), as to whether *Ring v. Arizona*, 536 U.S. 584 (2002), which invalidated Arizona's scheme of judge-sentencing in capital cases, was retroactive on collateral review. *Comer v. Stewart*, 312 F.3d 1157 (9th Cir. 2002) (*Comer II*). Once the Supreme Court definitively ruled that *Ring* does not apply retroactively to habeas petitions, *Schriro v. Summerlin*, 542 U.S. 348 (2004), *rev'g Summerlin v. Stewart*, 341 F.3d 1082 (9th Cir. 2003) (en banc), the motions to dismiss were ready for resolution. However, the majority, again *sua sponte*, ordered briefing on whether Comer can waive his pending habeas appeal if the district court erred in denying his original habeas petition and his constitutional rights were in fact violated during his state trial. Order, January 20, 2005. Habeas counsel, Comer's special counsel, and the state complied and we heard oral argument May 17, 2005.

We must now answer the question on which we reserved judgment on June 6, 2000.

## II

### A

Habeas counsel argue that the district court improperly credited Johnson's opinions over those of Kupers. However, the court's credibility determination is well supported in the record as Kupers is not trained as a forensic psychiatrist, has not worked in a correctional setting, and conducted a more limited examination of Comer than Johnson. They also fault the court's finding that Comer did not suffer from depression, relying mainly on Comer's writings over the years. While some of Comer's letters may exhibit some of the symptoms of depression, others do not. In any event, the findings are supported by Johnson's report, Comer's own testimony, and Judge Silver's observations of Comer in court. The court's findings on post-traumatic stress disorder and SHU Syndrome turn on the absence of depression and are not clearly erroneous for the same reason its conclusion that Comer does not suffer depression is not.

Regardless, the court found that Comer has a rational understanding of his legal options. This plainly appears from the court's colloquy with Comer during the evidentiary hearing. He understands his claims on appeal, their chances of success, the consequences and next steps if his appeal were to succeed, and what he would do in those circumstances. Kupers is also of the opinion that Comer has a rational intellectual understanding of his legal options.

Habeas counsel contend that Comer is nonetheless not competent to withdraw his appeal because his alleged mental illnesses prevent him from making a rational choice among the options. They rely upon Kupers's opinion to posit that depression leads to suicidal ideation which causes Comer to want to drop his appeal and submit to execution. However, there is no evidence that Comer has ever tried to commit suicide, despite opportunities to do so, or is suicidal. More

importantly, much the same argument was made and rejected in *Dennis ex rel. Butko v. Budge*, 378 F.3d 880, 892-93 (9th Cir. 2004). To say that an inmate who chooses not to fight execution does so because he has lost hope and wants to die is circular. Also, to say that an inmate who chooses not to fight execution is making an irrational choice misses the point of *Rees*, which is not concerned with the rationality of the *decision* but with the inmate's "*capacity* to appreciate his options and make a rational choice among them." *Dennis*, 378 F.3d at 890.[2] There can be no serious question based upon the record and the district court's findings that Comer does not have any mental problem that causes him to be unable to understand his options or to lack the capacity to make a rational choice among them.

---

[2]*Rees* articulated the competence question for the district court to determine as "whether [Rees] has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." 384 U.S. at 314. The Court later confirmed that the phrase " 'rational choice' " in *Rees* means nothing different from " 'rational understanding.' " *Godinez v. Moran*, 509 U.S. 389, 398 n.9 (1993); *see also Whitmore v. Arkansas*, 495 U.S. 149, 166 (1990) (asking in "next friend" case whether the prisoner has capacity to have a rational understanding with respect to continuing or abandoning further litigation). We have adhered to this approach. *See, e.g.*, *Dennis*, 378 F.3d at 890; *see also Smith ex rel. Missouri Public Defender Comm'n v. Armontrout*, 812 F.2d 1050, 1057 (8th Cir. 1987) (recognizing inquiry as whether decision of prisoner under sentence of death to waive post-conviction remedies is the product of a rational thought process and rejecting argument that waiver should not be allowed if there is any possibility that the decision is a product of mental disease, disorder or defect); *cf. Rumbaugh v. Procunier*, 753 F.2d 395, 398-99 (5th Cir. 1985) (breaking the *Rees* standard into three questions: (1) is the person suffering from a mental disease or defect; (2) if so, does that disease or defect prevent him from understanding his legal position and the options available; (3) if not, does that disease or defect nevertheless prevent him from making a rational choice among his options — and noting that if the answer to the first question is no, the court need go no further because the person is competent).

B

In addition to determining whether Comer's decision to withdraw his appeal was competent, we specifically instructed the district court to determine "whether Mr. Comer's conditions of confinement constitute punishment so harsh that he has been forced to abandon a natural desire to live." *Comer I*, 215 F.3d at 918. "A waiver is voluntary if, under the totality of the circumstances, it was the product of a free and deliberate choice rather than coercion or improper inducement." *Id.* at 917 (quoting *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998)). Habeas counsel challenge the district court's ruling that the conditions of Comer's confinement did not coerce his decision on several grounds, none of which is persuasive.

First, they point out that Comer got a radio and television within six months of the evidentiary hearing and speculate that those privileges will be taken away once this litigation ends. There is no evidence of this, and Comer himself attributes these improvements to improvement in his own behavior. Next, habeas counsel contend that remorse cannot be the true reason for Comer's decision because he opposes the death penalty. They also assert that it is of recent vintage, therefore must be a fabrication. However, in response to the district court's questions, Comer stated that his views have changed as he has matured, and he reconciled his personal opposition to the death penalty with acceptance of his punishment as appropriate for the crimes he committed. The district court's exploration of the conditions of Comer's confinement and their effect on his decision was exhaustive. It is impossible to be clearly and firmly convinced that its findings are erroneous.

In sum, Comer is competent to withdraw his appeal in that he does not suffer from a mental disease, disorder, or defect but even if he does, it does not impair his capacity to understand his legal options and to make a rational choice to forego

further legal proceedings. Further, his decision to withdraw his appeal is voluntary because it is the product of a free and deliberate choice and an unconstrained will, uncoerced by the conditions of his confinement in SMU II. As Comer has competently and voluntarily asked to withdraw his appeal and terminate habeas counsel's representation, he is entitled to do so. Accordingly, the Attorney General's, and Comer's, motions to dismiss Comer's appeal of the denial of his habeas petition by the district court should be granted.

## III

Having determined that Comer is competent to decide to withdraw his habeas appeal and that his decision to do so is voluntary, we lack jurisdiction to take any action with respect to his pending appeal other than to dismiss it. Habeas counsel acknowledge in their brief that "the order entered by a majority of the Supreme Court in *Gilmore v. Utah*, 429 U.S. 1012 (1976), disempowers this court to intervene and stop such an execution if the person who is to be executed validly waves [*sic*] his right to a habeas appeal." Regardless, they suggest, Comer's waiver wasn't "knowing" because it could not be "knowing" until it is known what this court will do with his appeal. They surmise from the majority's January 20, 2005 order, which asked counsel to assume that the district court erred in denying Comer's original habeas petition and that his constitutional rights were in fact violated during his state trial, that this court is of the view that Comer should have a new trial.[3] If so, they propose that the way to get a proper waiver of Comer's federal habeas appeal is for this court *first* to announce its intention to reverse the district court on its reso-

---

[3]I objected to the majority's January 20, 2005 order precisely because its phrasing appeared to telegraph a particular result. As it turned out, habeas counsel interpreted the order as indicating a "preliminary consideration of the merits" that "left this Court of the view that, if Mr. Comer waives his appeal, he will be waiving the right to a reversal of the District Court's judgment and to a ruling entitling him to a new trial."

lution of Comer's habeas petition and *then* to inquire of Comer whether — with knowledge of that prospect — he elects to relinquish his right to reversal and a new trial.[4]

Of course it cannot be gainsaid that if Comer were to know how his appeal would come out, he would be in a position of superior knowledge to that which he now has. So would every defendant who waives his constitutional right to a trial by entering a plea of guilty be in a position of superior knowledge if he knew in advance precisely how his trial would turn out. Likewise every defendant who waives his right to be tried by a jury would know more if he knew before deciding to opt for a bench trial how he would fare in front of each trier of fact. There is no question that waiver of any constitutional right, whether to trial, or direct appeal, to be tried by a jury, or to be represented by counsel, must be competently and knowingly, voluntarily, and intelligently made; but no case has ever suggested that a waiver cannot be knowing if it is not informed by hindsight. Every defendant has the right to waive a right so long as the court is satisfied that he is competent and uncoerced and has taken the relevant considerations into account. That is clearly the case here.

Comer was advised by his counsel of the prospects for reversal on appeal from denial of his habeas petition, and his testimony at the evidentiary hearing reveals that he was aware of the prospects and took the probability of reversal into account in reaching his decision to withdraw his appeal. He left no doubt that he understood how good a case habeas counsel thought he had; indeed, Comer testified, they believed his appeal "likely will be successful as to his death sentence" and "I think they're right." He recognizes that even if his con-

---

[4]Counsel do not comment on whether a truly knowing decision can be made after the panel's opinion comes down, or whether it can only be after the full court acts on a petition for rehearing en banc, or whether it needs to wait until after the Supreme Court has ruled on a petition for writ of certiorari.

viction for murder is not overturned, he might get a different sentence. He displays considerable insight into the issues on appeal and how they are apt to play out. And he has thought through how he would respond in the event reversal were to occur. In short, as a matter of fact, Comer's decision is fully informed by an understanding of the risks, benefits and consequences of pursuing the appeal. Knowing the odds, Comer has repeatedly adhered to his choice including, as his special counsel represented, as recently as the day before argument in our court.

No one is entitled to a preview, let alone an advisory opinion, from the court. Habeas counsel appear to acknowledge this but to argue otherwise, believing they "must assume from the [c]ourt's questions that its preliminary examination of the case has left it confronted with [the] stark reality [that this is not simply a case involving a death sentence but, *ex hypothesi*, a case involving an unconstitutional death sentence]." "Under these circumstances," they submit, "it is not forbidden to adhere to that view or to publish it simply because Mr. Comer may then make a choice to relinquish the consequence and retroactively moot the constitutional issues." I disagree on many levels.

Nothing should ever be assumed about the outcome of any case from questions posed by a judge. Questions can be asked for a host of reasons having nothing to do with any predetermined view of the merits. But even if the questions posed in this case did signal where those who propounded them were coming from and might go, habeas counsel, special counsel, and Comer were well aware of the queries and their implications, yet Comer has persisted in his decision to withdraw his habeas appeal. Beyond this, the decision that habeas counsel contemplates is either advisory, in which case it is meaningless, or it is for real, in which case it cannot be ignored. How Comer could "withdraw" from a final judgment ordering the writ to issue escapes me. Finally, and most importantly, *nothing* that the majority, or I, might state or imply on the merits

can matter because we have no jurisdiction to say anything at all.

*Gilmore* makes this clear. There a "next friend" of Gary Gilmore, a convicted murderer who had been sentenced to death, filed an application for stay of execution in the Supreme Court. The Court noted that she would have had standing only if Gilmore, who had waived his right to appeal under state law, was incompetent to do so. The record convinced the majority that he had knowingly and intelligently done just that. 429 U.S. at 1013. As Chief Justice Burger observed in an opinion concurring in the Court's order, Gilmore had full knowledge of his right to appeal, including that his attorneys believed there were substantial grounds for appeal, that the constitutionality of Utah's death penalty statute had not yet been reviewed, and that in his counsels' view there was a chance that it would eventually be held unconstitutional. The trial court advised him of his rights. "Gilmore stated that he did not 'care to languish in prison for another day,' that the decision was his own, and that he had not made the decision as a result of the influence of drugs or alcohol or as a result of the way he was treated in prison." *Id.* at 1015 n.4 (Burger, C.J., concurring). He also told the Utah Supreme Court that he opposed any appeal and wished to withdraw the appeal previously filed without his consent. With the record establishing a knowing and intelligent waiver of Gilmore's right to seek appellate review, the Chief Justice concluded that the Court was without jurisdiction to entertain the "next friend" application because there was no present dispute between Gilmore and the State of Utah. *Id.* at 1016 (Burger, C.J., concurring). Justice White dissented on the footing that "the consent of a convicted defendant in a criminal case does not privilege a State to impose a punishment otherwise forbidden by the Eighth Amendment." *Id.* at 1018 (White, J., dissenting). He saw no jurisdictional barrier to addressing the merits of the "next friend" petition because, in his view, Gilmore could not waive resolution of the serious question concerning the constitutional validity of his death sentence.

However forceful Justice White's views may be, they were in dissent. We are obliged to follow the Court's order which, as habeas counsel puts it, "disempowers this court to intervene and stop such an execution if the person who is to be executed validly waves [*sic*] his right to a habeas appeal."**⁵**

That Comer is seeking to withdraw his habeas appeal himself — rather than a next friend seeking in his stead to stay execution — is of no moment. Although the jurisdictional basis for addressing the issue is different because the district court and we have jurisdiction over Comer's habeas petition (until it is withdrawn), whereas a "next friend" must establish standing to bring the action, the bottom line inquiry is the same: has the defendant competently decided to forego further relief in his own behalf. *See, e.g.*, *Rees*, 384 U.S. at 314; *Whitmore*, 495 U.S. at 165-66; *Dennis*, 378 F.3d at 888-89.

Nor is it consequential that Comer originally appeared to consent to habeas counsel's representation and to the filing of

---

**⁵***See also Evans v. Bennett*, 440 U.S. 1301 (1979) (in chambers opinion by Rehnquist, Circuit Justice, referring "next friend" application to the full court in light of the dissents in *Gilmore* but the Court denying it); *Lenhard v. Wolff*, 444 U.S. 807 (1979) (same, over dissent by Justice Marshall asserting in accordance with the *Gilmore* dissent that the consent of a convicted defendant in a criminal case does not privilege the state to impose an unconstitutional punishment and that the defendant has no right to "state-administered suicide," *id.* at 815); *Hammett v. Texas*, 448 U.S. 725 (1980) (per curiam) (granting motion of death-row inmate to withdraw petition for a writ of certiorari in the absence of any question about his competence, over dissent reflecting views of the *Gilmore* and *Lenhard* dissents, *id.* at 732 (Marshall, J., dissenting)).

Circuit cases considering analogous problems are consistent with this rule. *See, e.g.*, *United States v. Arevalo*, 408 F.3d 1233, 1236 (9th Cir. March 26, 2005) (holding that once an appeal is voluntarily dismissed, appellate courts no longer have jurisdiction over the merits of the appeal, and citing law to the same effect in the Fifth, Sixth and Seventh Circuits); *United States v. Jeronimo*, 398 F.3d 1149, 1152-53 (9th Cir. 2005) (recognizing that appellate court lacks jurisdiction to consider merits of an appeal when there is a valid and enforceable waiver of the right to appeal).

papers in this court. Comer has moved to discharge habeas counsel, and the district court found that he was competent to terminate their representation and that his decision to do so was voluntary. He explained to the district court that even though it looked inconsistent for him to file a notice of appeal that he sought to withdraw, if he had it to do over again, knowing what he now knows, he would not have appealed. Comer said that he signed the form at the time for his lawyer, not because he personally wanted to appeal. Upholding Comer's decision to terminate habeas counsel, and to withdraw the appeal even though he had signed onto filing it, was well within the district court's discretion. In any event, whether or not habeas counsel are now terminated (as I believe they are) and are effectively in the position of a "next friend," Comer is not precluded from withdrawing his habeas appeal simply on account of the fact that he had originally consented to counsel's filing it. Otherwise, *Rees* would not have come out as it did. There, the petition for certiorari was filed with the defendant's consent but he thereafter directed counsel to withdraw it and to forego further legal proceedings.

In short, we have no right to reach the merits. We must affirm the district court's ruling. And I would.